48 So.2d 369

ARNOLD et al. v. SUN OIL CO. et al.
No. 38763.

May 31, 1949.

On Rehearing June 30, 1950.

Plauche & Plauche, Lake Charles, Shollars & Gunby and Dhu Thompson, Monroe, James T. Spencer, Farmerville, for defendants-appellants.

Dhu Thompson, Monroe, curator and tutor ad hoc.

Liskow & Lewis, Lake Charles, Oliver & Digby, Monroe, Tinsley Gilmer, Milling, Godchaux, Saal & Saunders, New Orleans, Geo. C. Schoenberger, Jr., New Orleans, amici curiae.

O'Niell & O'Niell, New Orleans, Hudson, Potts, Bernstein & Davenport, Monroe, McIntosh, Sims & Hester, Oak Grove, Ellis, Ellis & Lancaster, James W. Ellis, New Orleans, for plaintiffs-appellees.

VIOSCA, Justice ad hoc.

This is a petitory action, in which one of the plaintiffs, Effie Dexter Arnold, seeks to be recognized as the owner of an undivided one-half interest in 80 acres of land on which there is a producing oil well. This tract is situated in the Parish of Richland, State of Louisiana, and is described as follows: SE¼ of SW¼ of Section 14, and NE¼ of NW¼ of Section 23, Township 17 North, Range 9 East. Each of her coplaintiffs, Robert B. Prentice and Murray Hudson, seeks to be recognized as the owner of a fractional royalty interest in the minerals under this land by virtue of a deed to each from Effie Dexter Arnold dated August 25, 1945, and plaintiff Prentice seeks, in addition, to be recognized as

the owner of a mineral lease granted to him by Effie Dexter Arnold.

Defendants now before the court are the heirs and representatives of Mrs. Elizabeth K. Anding and James L. Anding, Sr., who claim the entire ownership of the property in question, and Charles H. Murphy, Jr., and Sun Oil Company, owners of an oil, gas, and mineral lease dated August 25, 1944, covering this tract, executed by Mrs. Elizabeth K. Anding, widow of James L. Anding, Sr.

The district court rendered judgment in favor of plaintiffs and against defendants, decreeing Effie Dexter Arnold to be the true and lawful owner of an undivided one-half interest in the land, subject to the lease to Prentice and to sales by her of royalty interests to plaintiffs Prentice and Hudson, and further ordering and decreeing that a certain tax sale from J. L. Anding to James L. Anding, Jr., be cancelled and erased from the records of Richland Parish, and reserving to plaintiffs the right to an accounting for the oil, gas, and other minerals produced from the property, subject to the proportionate part of any taxes that may be due. From this judgment defendants have appealed.

Both plaintiffs and defendants derive their title from Mariah Dexter, who, authorized by her husband, Boston Dexter, acquired the property here in controversy on December 9, 1875. Mariah and Boston Dexter both died before the year 1909 with-

out having parted with title to the property. Thereafter a deed was executed on May 31, 1912, by one of their sons, Walter Dexter, and by Louis and Willie Dexter, who were also members of the Dexter family but who had no interest in the property, to George Calder, with full and complete warranty of title, for a recited consideration of $121.68, in which deed it was recited that they conveyed all of their "rights and titles & interests" in the property.

At the time this deed was executed, however, Walter Dexter, one of the vendors, actually owned only a one-half interest in the property, and the other one-half was owned by plaintiff Effie Dexter Arnold, daughter of Henry Dexter, a deceased son of Mariah and Boston Dexter. According to the record, this plaintiff, who was born on August 22, 1902, and who was 43 years old at the time this suit was filed, has never divested herself of her one-half interest in this property.

By sheriff's deed dated August 11, 1915, the property was acquired by the Central Savings Bank & Trust Company, having been seized under a writ of fieri facias to satisfy a mortgage executed by George Calder, and was by this institution conveyed to Daniel T. Phillips under a deed dated November 28, 1917. Phillips conveyed this property to James L. Anding, Sr., on January 4, 1919. As per tax deed dated June 4, 1928, the sheriff and ex officio tax collector sold the property to James L. Anding, Jr., for the 1927 taxes assessed to J. L.

Anding. Approximately four years later, on June 14, 1932, James L. Anding, Jr., conveyed the property to his mother, Mrs. Elizabeth K. Anding, widow of James L. Anding, Sr., Anding, Sr., having died on December 31, 1928.

Thereafter Mrs. Elizabeth K. Anding executed an oil and gas lease in favor of defendant C. H. Murphy, Jr., who subsequently assigned a one-half interest therein to defendant Sun Oil Company. After the execution of the lease, Mrs. Anding conveyed to her children an interest in the mineral rights, and she and these children, together with the lessee and his assignee, were named as the original defendants herein. After the filing of this suit, Mrs. Anding and her son, James L. Anding, Jr., both died, and their heirs have been substituted as defendants by appropriate proceedings.

Plaintiffs assert that the purported tax sale dated June 4, 1928, by Anding, Sr., to Anding, Jr., " * * * was simulated, null, void and of no effect; that James L. Anding, Jr. did not make the purchase at tax sale in good faith, for himself, or with his own money, but, rather, that said tax purchase was made in collusion with his father, for his father, and with money furnished by his father; that this attempted tax sale was an illegal use of the machinery provided by law for the collection of taxes, contrary to public order and morals, and that in no event could it have the effect of transferring title from James L. Anding, Sr., to James L. Anding, Jr., or of conferring any

right whatsoever upon him, or upon any assignees or other claimants of title under him".

Defendants, after setting forth their chain of title from Mariah Dexter, in support of the validity of their title plead the prescriptions acquirendi causa of 10 and 30 years, and also urge a plea of five years' prescription or preemption against plaintiffs' attack on the tax sale under Article X, Section 11, of the Louisiana Constitution. In their answer defendants further plead that by laches, long silence, inaction, and acquiescence plaintiffs have ratified the tax sale and are now estopped to deny its validity.

Defendants Murphy and Sun Oil Company also urge that they were bona fide third purchasers on the faith of the public records with reference to their acquisition of the oil and gas lease granted by Mrs. Anding, and that, as such, they are not bound or affected by any fraud or simulation in the title of their grantor not appearing of record or by any unrecorded rights and equities of any other parties.

The plea of prescription of 30 years acquirendi causa is without merit as Effie Dexter Arnold did not become 21 years of age until August 22, 1923, and this suit was filed on October 30, 1945, a lapse of less than 23 years. The prescription of 30 years acquirendi causa does not run against minors. Civil Code, Article 3522.

The pleas of laches and estoppel are without merit. Effie Dexter Arnold, at the age of two years, upon the death of her mother, was placed in the care of Amanda White Shafer, who did not reside on the property. Thereafter, Effie Dexter Arnold was married and moved from the community, and she did not learn of her interest in the property until shortly before the institution of this suit. It is not established that she at any time committed any act calculated to mislead or deceive anyone; and her failure to assert a right of which she was ignorant cannot serve as the basis of a plea of estoppel or laches.

Defendants, in support of their plea of 10 years' prescription acquirendi causa, contend that the title, possession, and good faith of George Calder were the basis for the running of prescription, which continued to run and accrue under subsequent transferees from Calder. They make the same contention with respect to the title, possession, and good faith of each of the subsequent transferees—Central Savings Bank & Trust Company, Daniel T. Phillips, James L. Anding, Sr., James L. Anding, Jr., and Mrs. Elizabeth K. Anding, widow of James L. Anding, Sr. It therefore becomes necessary to consider the title, the good faith, and the possession of each of these respective transferees, from George Calder to and including Mrs. Elizabeth K. Anding, widow of James L. Anding, Sr.

There is and can be no dispute as to the sufficiency in point of form of the titles of any of these transferees with the exception of that of George Calder. Plaintiffs attack

the sufficiency of Calder's title because of certain erasures in the original deed and because Walter, Louis, and Willie Dexter did not convey the whole property but only their "rights and titles & interests" therein. The first contention is without merit. The original deed is in the record. An examination thereof discloses that the notary public who executed the act first inscribed the names of the vendors without their marital status and thereafter erased them and reinscribed them with their marital status. The description of the property apparently was first written thus:

"The SE¼ of the NˢW¼ and the NE¼ of the NW¼ of Section 23, T. 17 N. R9 East, containing 80 acres of land more or less".

It will be noted that the first quarter section mentioned apparently was first typed "SW¼" and the letter "N" later typed partially over the "S". The whole description was typed over with capital "X's", and the following description was inserted directly below:

"The SE¼ of the SW¼ of section 14, and the NE¼ of the NW¼ Section 23. All in T. 17 N. R. 9 E. Containing 80 acres more or less."

In the first description the whole acreage was erroneously described as being in Section 23, whereas one 40-acre tract was in and the NE¼ of the NW¼ Section 23. Obviously these corrections would not invalidate the deed, and this attack on it must fall.

The second ground of attack on the Calder deed is likewise without merit. Ever since the decision of this court in Read v. Hewitt, 120 La. 288, 45 So. 143, decided December 2, 1907, it has been recognized that a sale of all the vendor's right, title, and interest in and to certain described property vests the whole estate in the vendee, and that such a title may serve as the basis of the prescription of 10 years. See Waterman v. Tidewater Associated Oil Co. (Tambour Corporation v. Rectangle Ranche Co.), 213 La. 588, 35 So.2d 225, and authorities cited therein.

The next question to be considered is the good faith of the respective transferees. There is no evidence in the record that George Calder acquired this property in bad faith, and, in the absence of such showing, under our law good faith is presumed in matters of prescription, and he who alleges bad faith in the possessor must prove it. Article 3481, Louisiana Civil Code; Barrow v. Wilson, 38 La.Ann. 209; Brewster v. Hewes, 113 La. 45, 36 So. 883; Harrill v. Pitts, 194 La. 123, 193 So. 562. The deed under which Walter, Louis, and Willie Dexter transferred their right, title, and interest in the property to Calder is an outright conveyance by them in their own right as owners, and makes no reference to the estate of Mariah Dexter, the record owner of the property. There is nothing within the four corners of the deed which would have put Calder on notice that the property involved was succession property, and that

the vendors were acting in the capacity of heirs or were disposing of inherited property; and there is nothing in the record which would have established a doubt in Calder's mind as to the validity of the title that was being conveyed to him so as to place him under the duty of making an inquiry, under penalty of being in legal bad faith for his failure so to do.

The next transferee, Central Savings Bank & Trust Company, was likewise in good faith, not only because there is nothing in the record to rebut the presumption of good faith, but because there is affirmative testimony to confirm it. Travis Oliver, president of the bank at the time he testified, and executive vice president who handled the transactions concerning this property, testified that the bank believed that Calder was the owner of the property at the time of the making of the loan to him and the execution of the mortgage, as well as at the time of the institution of the foreclosure proceedings and the execution of the sheriff's deed to the bank on August 11, 1915. It was not until December 30, 1916, that the bank, preparatory to selling the property, secured an abstract of the title and learned for the first time that there was a "break" in the title and an outstanding interest in a minor heir. From that date the good faith of the bank ceased.

When the Central Savings Bank & Trust Company conveyed the property to Daniel T. Phillips by deed dated November 28, 1917, he had been advised by an attorney of the defect in the title. The bank placed the property for sale with an agent named Shaw, and advised Shaw that it would warrant the title to the extent of $1300 only, the amount the bank had invested in the property. It offered Shaw as his commission all of the sale price in excess of that amount. Shaw received $462.92 as his commission, and he divided this with Phillips, obviously because Phillips was willing to take the defective title with the limited warranty. These facts are confirmed by the testimony of Oliver and Phillips and by the records of the bank introduced in evidence. There can be no doubt, therefore, of the bad faith of Phillips.

On January 4, 1919, Daniel T. Phillips sold the property to James L. Anding, Sr., with full warranty. Over the strenuous objection of defendants, Phillips was permitted to testify that he advised Anding that the title was defective, and that there was an outstanding interest in a minor Dexter heir. The objection to the admissibility of Phillips' testimony is based on the contention that Phillips, who conveyed the property to Anding by warranty deed, should not be permitted to repudiate his solemn declarations made in an authentic act. But this rule has no application where the rights of third parties are involved and there is a plea of fraud or bad faith. The defendants in claiming title to the property by prescription acquirendi causa, based on the *good faith* of James L. Anding, Sr., are in the position of plaintiffs in recon-

vention in a petitory action. Since there is no replication in Louisiana, plaintiffs in the original suit have a right to urge the bad faith of Anding and offer evidence in support thereof without the formality of a written plea. Willis v. Ruddock Cypress Company, Ltd., 108 La. 255, 32 So. 386; Abshire v. Lege, 133 La. 254, 62 So. 667; Aertker v. John W. Ball, Inc., La.App., 17 So.2d 309; Green v. McDade, La.App., 17 So.2d 637. The testimony of Phillips is therefore admissible. However, his testimony, though admissible, is entitled to little or no weight unless confirmed, for two reasons. In the first place, Phillips' statement concerning the defective title is alleged to have been made to a person now deceased, who is not in a position to deny it. In the second place, Phillips, prior to the date he testified, made the statement to two reputable attorneys and to one of the Andings that he could not swear positively that he had told Anding, Sr., about the outstanding interest of the minor Dexter heir. Under oath, however, Phillips insisted that his best recollection was that he did so advise Anding, Sr.

That the question of heirship of the Dexters did come up for discussion before Anding, Sr., took his title is established conclusively, however, by the fact that the abstract of title prepared for the Central Savings Bank & Trust Company, which showed the "break" in the title, was delivered to Anding, Sr., before he took title, and by the further fact that an affidavit of heirship of Mariah Dexter, under date of January 4, 1919, the date of the sale, was procured and recorded in the notarial records, and that the original of this affidavit was in the possession of the Andings and was produced by them in compliance with a subpoena duces tecum issued on the motion of the plaintiffs. That affidavit reads as follows:

"State of Louisiana, 
"Parish of Richland.

"Personally came and appeared before me, the undersigned authority, Harrison Bennett who being duly sworn deposes and says:

"That he has known Maria Dexter since his early childhood, that he is now 52 years old, that he remembers when Maria Dexter bought the SE¼ of the SW¼ of Sec. 14, Township 17 North, Range 9 East and the NE¼ of the NW¼ Sec. 23 Township 17 North Range 9 East from H. R. Lott in the year 1875.

"That Maria Dexter gave birth to only four children as follows:—Warren White, Walter Dexter, *Henry Dexter* and Lula Dexter and *that on May 31st, 1912 the only remaining heirs of Maria Dexter were her son, Walter Dexter, and Louis Dexter and Willie Dexter, who were the children of Lula Dexter, her daughter.*

"That Maria Dexter was in continuous and peaceable possession of the above described property from the year 1875 until her death which occurred about the year 1906.

"That he, Harrison Bennett, is a resident of the Parish of Richland, State of Louisiana.

his
Harrison X Bennett
mark

"Thus done and signed in the presence of me, Notary, and in the presence of the attesting witnesses on this the 4th day of January, A.D. 1919.
"Attest:

"W. R. Crawford "B. Skidmore
"H. E. Miles "Notary Public."
(Italics ours.)

It will be noted that in this affidavit *Henry Dexter,* who was the father of Effie Dexter Arnold, is listed as one of the children of Mariah Dexter. Therefore, before Anding, Sr., took title to the property, he knew that Henry Dexter was a child of Mariah Dexter; and it thereupon became his duty under the law to make a complete and exhaustive investigation to determine whether Henry Dexter was still alive or whether he had any descendants. The affidavit contains no *statements of fact* in this regard. It contains merely the *legal conclusion* that on May 31, 1912, the date of the Calder deed, which was some six years after the death of Mariah Dexter and some three years after the death of Henry Dexter, the *"only remaining heirs"* of Mariah Dexter were her son Walter Dexter, and Louis and Willie Dexter, who were the children of Lula Dexter, her daughter. In Knight v. Berwick Lumber Co. (McHugh v. Same), 130 La. 233, 57 So. 900, 902, where the

president of the defendant company made a personal investigation of the title and learned sufficient facts to put him on inquiry but did not pursue the investigation to the extent necessary to learn the ultimate facts, this court said:

"To be in good faith, the possessor must have the positive belief that he is the true owner of the property he holds. If he doubts the validity of his title, his possession cannot be the basis of the prescription of 10 years. Gaines v. Hennen, 24 How. 553, 16 L.Ed. 770. Doubt as to ownership, or the right to alienate, is inconsistent with good faith, because doubt is the mean between good and bad faith. Good faith demands a firm and positive belief. Carpentier-Du Saint, Répertoire du Droit Français, vol. 31, p. 294, No. 1,534. While the president of the Berwick Lumber Company was not bound, as a matter of law, to inquire into the title of Bradley, he voluntarily undertook an investigation that disclosed to him the facts that the property was assessed to the estate of Richard Lynch and would be assessed to Mrs. Hartman, from or through whom Bradley said he had acquired his title. If the president of the lumber company had *honestly believed* that Bradley was the real owner of the property, it is fair to presume that he would not have undertaken such an investigation, and would not have sought 'corroborative' evidence of Bradley's statements as to the title. We therefore conclude that the Berwick Lumber Company was a possessor in

bad faith, and that its plea of prescription should have been overruled. * * *"

The court further held, as shown by the syllabus by the court, that "* * * A doubt sufficient to induce the possessor to make an investigation of the title of his vendor is presumed to have continued down to the sale, in the absence of evidence tending to show its removal by adequate information derived from the records or other trustworthy sources".

In Roberson v. Reed, La.App., 190 So. 153, 156, where the purchaser knew that the vendor had a son and there were two living children of a predeceased son, but did not know that these two latter children inherited by representation and had an interest in the property, the Court of Appeal for the Second Circuit, through Judge Hamiter, held that the purchaser was in bad faith since error of law can never be alleged as a means of acquiring property, citing Civil Code, Article 1846. The court cited numerous decisions of this court in support of the proposition that "* * * It is only in instances where there is error as to facts, and not as to the law, where legal good faith is presumed and made the basis of the prescription of ten years acquirendi causa".

In Dinwiddie v. Cox, 9 So.2d 68, 71, another decision of the same Court of Appeal, in which we denied certiorari on June 29, 1942, the court held that a purchaser of land from an heir, with knowledge that the ancestor had left other heirs, who, after discovering that the other heirs were dead, did not more thoroughly investigate the family history to determine whether the deceased heirs had left descendants, was not a possessor in good faith and could not claim prescription of 10 years acquirendi causa. In the body of its opinion the court said:

"It is true, as contended, no one is required to examine the public records to determine the validity of title to real property he contemplates purchasing as a condition precedent to good faith. He may purchase without any investigation of the title and if the four named essentials exist, he is protected by the prescription of ten years. But if he is not satisfied with the title offered by the seller and institutes an investigation into its validity, from which facts and conditions are revealed which should put a reasonably prudent person on inquiry, it then devolves upon him to pursue every lead and ferret out all the facts to the end that he may not purchase until he has complete information before him. If he does not do this, but purchases upon erroneous assumptions and conclusions, he does so at his own risk and peril.

"Mr. Nance made a good beginning in his inquiry into the family history of Lucinda Thomas' heirs, but he quit too soon. He overlooked the fact that although the original heirs, save Will, were dead they might have left descendants who would stand, as regards the land, in the shoes of their father or mother."

The court thus held that a prospective purchaser who learns of the existence of a child, but fails to investigate exhaustively the *question of fact* of whether that child left descendants, is in the category of one in legal bad faith, and therefore is not entitled to plead the benefits of the prescription of 10 years acquirendi causa. Applying this well established rule to this case, we find that Anding, Sr., who had knowledge of the *fact* that Henry Dexter (the father of Effie Dexter Arnold) was a child of Mariah Dexter, was under the obligation to make further inquiry into the family history to ascertain whether Henry Dexter left any children, and could not rely on the *legal conclusion* that Mariah Dexter had only three heirs left on May 31, 1912. We accordingly conclude that James L. Anding, Sr., was in legal bad faith, a conclusion which is confirmed by the subsequent tax sale, to which we shall now advert.

In 1928, some nine years after Anding, Sr., took title to the property, he permitted the sheriff and tax collector to adjudicate the property to his son, James L. Anding, Jr., for non-payment of the taxes for the year 1927, amounting to $36.30. At that time Anding, Sr., had a substantial estate, but he was heavily involved in debt and was ill with an incurable disease. He died a few months after the tax adjudication. His succession was opened, and his widow qualified as executrix. Anding, Sr., until the date of his death, and thereafter his widow until Anding, Jr., conveyed the property to her in 1932, remained in possession of the property, cultivated it through tenants, executed leases, made loans to the tenants, took crop liens, and paid the taxes. None of the tenants on the property knew Anding, Jr., in any of the transactions. At the time of the tax adjudication and thereafter, Anding, Jr., was in the State of Missouri, where he was employed by the Missouri-Pacific Railroad Company, where he was married, where he attended law school, and where he subsequently resided until the date of his death after this suit was filed. Shortly before the date of the tax adjudication, Anding, Sr., conveyed another piece of property to his son, Anding, Jr., by authentic act for a stated consideration of $550 and the assumption of a mortgage of $1040. In 1932 Anding, Jr., conveyed both of these pieces of property to his mother, Mrs. Elizabeth K. Anding, widow of James L. Anding, Sr., for a stated consideration of $4800. Mrs. Anding thereafter executed under date of December 11, 1944, a mineral deed to her five children, which was later corrected by an act of partition under date of September 20, 1945, which act reads as follows:

"Be It Known And Remembered that on this, the 20th day of September, A. D. 1945 personally came and appeared, before me, the undersigned Notary Public in and for Richland Parish, Louisiana, Mrs. Elizabeth K. Anding, surviving widow of J. L. Anding, Deceased, a resident of Richland Parish, Louisiana and James L. Anding, a resident of Franklin County, Missouri,

George K. Anding, Mary J. Hopson, wife of William B. Hopson, Elizabeth Thompson, wife of Julian Thompson and Corre B. Anding, a femme sole, residents of Richland Parish, Louisiana, sole heirs and children of J. L. Anding, Deceased, and who declare that as surviving widow and sole heirs of said J. L. Anding, Deceased, they own the hereinafter mentioned and described oil, gas and mineral rights, some of which were acquired prior to the death of J. L. Anding and belonged to the community of acquets and gains existing between he and his surviving wife, and some of which were acquired subsequent to his death with funds and property belonging to said community estate by his surviving widow, and which property therefore is owned by the parties hereto in the proportion of an undivided one-half interest to the surviving widow, Mrs. Elizabeth K. Anding, and an undivided one-half interest jointly by the heirs and children of J. L. Anding, Deceased.

"The parties further declare that they have heretofore made a purported partition of a portion of the oil, gas and mineral rights mentioned and described herein, and it is their intention by this act to annul and declare of no effect the purported previous partition, in lieu of which this act of partition is made.

"Appearers further declare that the property and rights of the community which existed between J. L. Anding, now deceased, and his surviving wife, Elizabeth K. Anding, was subject to the usufruct of said wife, one of the appearers herein, and that the parties hereto have agreed and do hereby make a partial partition of the property and assets belonging to said community estate, as follows:

"The community estate, being the owner of oil, gas and mineral rights in, on and under the hereinafter described land, do hereby and by these presents, divide and partition such mineral rights equally between appearers herein, and each of said appearers are to have, receive and own by virtue of this partition an undivided one-sixth interest in and to such rights, to-wit:

"a. Three-fourth of all oil, gas and mineral rights in, on and under the

"N½ of the NW¼ of Section 27, Township 17 North, Range 9, east in Richland Parish, Louisiana;

"b. All of the oil, gas and mineral rights in, on and under the

"SE¼ of the SW¼, of Section 14, and NE¼ of NW¼ of Section 23, Township 17, North, Range 9, east, in Richland Parish, Louisiana;

"c. All of the oil, gas and mineral rights in, on and under the

"SE¼ of the NW¼ of Section 33, Township 18, North, Range 9, east, in Richland Parish, Louisiana;

"d. All of the oil, gas and mineral rights in, on and under the

"N½ of the SE¼ of Section 11, and NW¼ of the SW¼, and all that part of the NE¼ of the NW¼ lying west of the Delhi-Winnsboro Public Road, Section 12, all in Township 16, North, Range 9, east, 47 acres more or less, in Franklin Parish, Louisiana.

"Elizabeth K. Anding, surviving widow of J. L. Anding, Deceased, hereby acknowledges receipt of personal property in her individual right from the community estate equal to the value of the difference between the undivided one-half interest which she owned in said mineral rights as surviving widow, and the one-sixth interest which she receives under this act of partition.

"The parties further declare that there are outstanding oil and gas leased [sic] on a portion of the land hereinbefore described, and that it is their intention, and they do hereby grant to the respective parties to this act the right of reversion which may flow from the abandonment of any existing oil, gas and/or mineral lease or mineral sale, and that each of the parties to this act of partition are hereby subrogated all rights to recover their proportionate part of any such reversion due to abandonment, prescription or other causes, equal to the interest conveyed and assigned to each herein.

"Thus Done, Read And Signed by the parties hereto, in the presence of the two undersigned, legal and competent witnesses and me, said notary, on the day and date herein first above written and I, said notary, sign hereto officially.

"Witnesses: Mrs. Elizabeth K. Anding
"W. B. Hopson James L. Anding
"L. E. Thorpe George K. Anding
 "Mary J. Hopson
 "Elizabeth Thompson
 "Corre B. Anding
 "Salon E. Smith
 "Notary Public"

The effect of this act was to place the property involved in this suit back into the succession of James L. Anding, Sr., to the same extent as if it had never been adjudicated at tax sale to James L. Anding, Jr. In view of this as well as all of the other pertinent facts, it is obvious that as between the parties the tax sale was a pure simulation and cannot serve as the basis of any new title in the widow and heirs of James L. Anding, Sr., for the purpose of establishing title by prescription or otherwise.

Defendants make two contentions against the charge of simulation. First, they contend that, because Anding, Sr., was heavily in debt shortly before his death, it is reasonable to conclude that the tax sale was legitimate. Pretermitting the fact that Anding, Sr., in spite of his financial difficulties had a substantial estate at the time, and that the taxes on all of his other property were paid for the same year, a complete answer to the contention that lack of funds was the cause of the tax sale is the fact that the tax adjudication was not made to

a stranger, but was made to one of the Andings, and it required a greater cash outlay to purchase the property at tax sale than to pay the taxes without the costs of sale. The other explanation is that given by the Anding children. They testified that James L. Anding, Sr., was indebted to James L. Anding, Jr., for money sent home by James L. Anding, Jr., to his father while Anding, Jr., was employed by the Missouri-Pacific Railroad Company at a salary of $150 per month, and that the tax sale was chosen as the means of repaying this indebtedness. They testified further that by 1932 the creditor and debtor relationship had been reversed because of advances made by Mrs. Elizabeth K. Anding to her son, James L. Anding, Jr., and that it was for this reason that James L. Anding, Jr., conveyed the property to his mother, But none of the Andings could give an estimate of the amount of the alleged indebtedness in either case, because the books in which these records were kept were burned in a fire which destroyed the Anding store. However, when asked why James L. Anding, Sr., had resorted to the device of a tax sale for the purpose of conveying this particular property to his son in consideration of a past indebtedness, when only a few months before he had conveyed to him another piece of property in consideration of a like past indebtedness by the generally accepted procedure of executing an authentic act, none of the Andings could give any explanation whatsoever for the use of this unusual method; and we may add that we can find none either, unless it was for the purpose of curing the defect in the title. We conclude, therefore, that as between the parties James L. Anding, Sr., and his estate were never divested of their interest in the property through the instrumentality of these simulated sales.

This brings us to the question of possession. It cannot be controverted that, from the time Daniel T. Phillips purchased the property until the present time, Phillips and his successors in title have continuously farmed the property and have been in continuous, uninterrupted, public, and unequivocal possession of the property. Since we have found, however, that all of these possessors were in bad faith, their possession cannot serve as the basis for marking the beginning of the period for the purpose of computing the 10 years necessary for the acquisition of title by the prescription of 10 years acquirendi causa. The possession must commence in good faith. As we have found that both Calder and the Central Savings Bank & Trust Company were in good faith, we must necessarily consider whether either of them possessed the property. And, as the time intervening between Calder's acquisition of the property in 1912 and the acquisition of the first bad-faith possessor, Phillips, in 1917 was a period of only five years, we must additionally determine whether the subsequent bad-faith possessors may tack their possession on to the possession of their predecessors in title who were in good faith in order to make up the

10 years necessary to meet the requirements of the law. We shall consider the question of tacking first.

Articles 3482 and 3493 of the Revised Civil Code read as follows:

"3482. It is sufficient if the possession has commenced in good faith; and if the possession should afterwards be held in bad faith, that shall not prevent the prescription."

"3493. The possessor is allowed to make the sum of possession necessary to prescribe, by adding to his own possession that of his author, in whatever manner he may have succeeded him, whether by an universal or particular, a lucrative or an onerous title."

This court more than 100 years ago, in 1840, had occasion to interpret the first of these articles in Devall v. Choppin, 15 La. 566. There, as here, plaintiff instituted a petitory action, and defendants filed a plea of 10 years' acquisitive prescription, which was held to be good. Good faith existed at the commencement of the prescription, but it was contended by the plaintiff that one of the intervening possessors, a man by the name of Baudin, had possessed in bad faith and therefore his possession could not be of any benefit to the defendants. In answering that contention this court said:

" * * * Had Baudin been the first possessor, or was the time to establish the prescription to be ascertained or computed by taking his possession as the commence-ment or origin of the right, the authorities quoted by plaintiff's counsel from Pothier and Troplong, would, perhaps, receive their proper application, and there would probably be no difficulty, under our law, to maintain him in his position. But here, Baudin was an intermediate possessor, and his predecessor was in good faith. * * * Baudin himself would have been entitled to prescribe; and in our opinion, the defendants who hold under him, ought to have the benefit of his, as well as of all the previous possessions. This doctrine is, undoubtedly, a proper and correct interpretation of the article 3448 [3482], of the Louisiana Code, that says: 'It is sufficient if the possession has commenced in good faith; and if the possession should afterwards be held in bad faith, that shall not prevent the prescription.' * * *" (Italics ours.)

In 1886, in the case of Barrow v. Wilson, 38 La. Ann. 209, the same question was discussed by this court, and in the course of that opinion we said:

"On the question of good faith, plaintiffs submit the point that one of defendants' authors, Burton, who had purchased from Cox, resisted the payment of his notes representing part of the purchase price, on the ground, judicially alleged, that Cox's title was defective. From the record it appears that this contention arose in 1875, four years after his purchase from Cox, and two years after the latter's purchase from the State.

"That argument is likewise answered by the text of the Code.

"Article 3482 reads: 'It is sufficient if the possession has commenced in good faith; and if the possession should have afterwards been held in bad faith, that shall not prevent the prescription.'

"Article 3481 reads: 'Good faith is always presumed in matters of prescription; and he who alleges bad faith in the possessor, must prove it.'

"These provisions of our law have been frequently expounded by this Court, and application has been frequently made of them in conformity with our present conclusions. * * *

"It is therefore safe to conclude that the doubt of the validity of the title of Cox which Burton once entertained, and which was evidently removed, as it appears that he subsequently paid the very purchase notes in question, cannot affect the good faith of Cox at the time of his purchase, or ·the resulting good faith in the present possessors, both in their purchase and in their possession."

In 1904, in the case of Brewster v. Hewes, 113 La. 45, 36 So. 883, 885, this court made the following observation and statement with reference to the problem with which we are concerned in the instant case:

"The law applicable to the subject is that he who acquires the ownership of an immovable from one whom he believes to be the owner, by a title which would be sufficient to transfer the ownership if derived· from the owner, and who holds continuous, uninterrupted, peaceable, public, and unequivocal possession thereof, as owner, 'prescribes for it in ten years'; that good faith is always presumed in matters of prescription, and that he who alleges bad faith in the possessor must prove it; and that it is sufficient if the possession has commenced in good faith, the fact that it is afterwards held in bad faith, *whether by the original possessor or his successor in title, not affecting the prescription. * * · * "* (Italics ours.)

In the case of Vance v. Ellerbe, 150. La. 388, 90 So. 735, 739, decided in 1922, we find the following:

"* * * Conceding· that Trezevant's vendees, Huron Land Company and Yarbrough, were in bad faith, which does not appear to be sustained by the record, this would not, in itself, have prevented the running of prescription, for the reason that it had validly commenced under the possession of Trezevant. ˙ C.C. art. 3482; Brewster v. Hewes, 113 La. 51, 36 So. 883."

As late as 1943, in the case of Goree v. Sanders, 203 La. 859, 14 So.2d 744, in the course of our opinion we had occasion to observe that, once possession is commenced in good faith, subsequent possession in bad faith does not prevent the running of prescription.

Counsel for plaintiffs have cited in their brief the opinions of the French commenta-

tors, the great majority of whom express the view that a possessor in bad faith cannot tack his possession on to the possession of a prior purchaser in good faith.

A thorough research has been done on the question here involved by the author of a comment appearing in the Louisiana Law Review, styled "Tacking of Possession for Acquisitive Prescription". 8 La.L.Rev. 105. The views of the French commentators and the jurisprudence of this state are discussed therein. It is pointed out that in the leading case of Devall v. Choppin, which we have discussed supra, this court, relying upon the writings of Troplong, enunciated the proposition that, if a successor can show that one of his authors was a possessor in good faith and had all the necessary ingredients for the 10 years' prescription, he could acquire the property by the 10 years' acquisitive prescription even though he as well as an intermediate author possessed in bad faith. This comment also shows that this rule has been consistently followed by the courts of this state.

However questionable the soundness of this doctrine of law may be, it is a well settled rule of property.

In support of their contention that the possession of earlier vendors cannot be tacked on to Anding's possession because Anding was not himself a purchaser in good faith, the plaintiffs cite and rely on the cases of Innis v. Miller, 10 Mart. (O.S.) 289, 13 Am.Dec. 330, and Barnett v. Botany Bay Lumber Co., 172 La. 205, 133 So. 446, 448. We do not consider these cases authority for the contention of plaintiffs.

The former case was decided in 1821, prior to the inclusion of the provision of Article 3482, as it now reads, in our law. Before the adoption of the Code of 1825, the law was merely that "It is sufficient to have commenced the possession fairly and honestly". La.Code of 1808, Art. 72, p. 488. That case, therefore, would not prevail over the plain interpretation of the provision, as it presently reads, by this court in the Devall v. Choppin case, supra.

The Barnett case did not involve a possessor in bad faith, but plaintiffs seize on the statement therein that "The possessor may add to his own possession that of his vendor, if both acquired in good faith * * *". If the correct inference from this statement is that the possessor may not add to his own possession that of his vendor if he acquired in bad faith, the court obviously made the statement inadvertently, for no mention whatever was made of the jurisprudence to the contrary, which we have discussed fully herein.

Plaintiffs argue that the possession of Anding, Sr., cannot be tacked on to the possession, if any, of Calder or the Central Savings Bank & Trust Company because acquisitive prescription could not commence to run against Effie Dexter Arnold until her emancipation on August 22, 1920, she being married and having reached the age of 18 years on that date; that the

element of good faith must be determined as of that date, and that, since James L. Anding, Sr., the holder of the property at that time, was in bad faith and without a just title, it could not commence to run even on that date.

This argument is predicated on the sole premise that prescription could not and did not run against Effie Dexter Arnold during her minority. This court in Stubbs v. Bain, 173 La. 544, 138 So. 96, 98, a case involving facts very similar to those in the one at bar, held that the acquisitive prescription did run against a minor under the facts as disclosed therein, and in our opinion that decision fully answers plaintiffs' argument herein.

Plaintiff in that case, Mrs. Mabel Allen Mouser, was born on June 20, 1902, and was married in the year 1919, three years after the defendant, H. H. Bain, went into actual possession of the property involved therein. Mrs. Mouser instituted her suit, a petitory action, on June 12, 1926, more than 11 years after Bain went into possession. To that suit defendants pleaded the prescription of 10 years acquirendi causa. Under the above stated facts, it can readily be seen that plaintiff therein became 22 years of age on June 20, 1924, after the effective date of Act No. 161 of 1920, and, since her suit was not instituted until June 12, 1926, this court held that the plea of acquisitive prescription was well founded, more than 22 years having elapsed from the date of her birth to the date of the institution of the suit.

Article 3478 of the Revised Civil Code, as amended by Act 161 of 1920, provides that:

"He who acquires an immovable in good faith and by just title prescribes for it in ten years. This prescription shall run against interdicts, married women, absentees and all others now excepted by law; and as to minors this prescription shall accrue and apply in twenty-two years from the date of the birth of said minor; provided that this prescription shall run against the heirs of said minor and shall not be interrupted in favor of any minor heirs of said minor. Provided that this act shall take effect on January 1st, 1922."

In the Stubbs case, cited supra, this court quoted from Thomann v. Dutel, 158 La. 1026, 102 So. 52, with approval as follows:

" 'Act 161 of 1920 was approved July 7, 1920. At the date of the passage of said act the prescription of 10 years acquirendi causa did not run against minors under the Civil Code.

" 'A purchaser in good faith under a title translative of property may have had actual possession of the same for 21 years, and then be subjected to a petitory action within 10 years after the minor had arrived at the age of majority. *The clear purpose of the act is to give stability to titles to real estate, by permitting the prescription of 10 years acquirendi causa to run against mi-*

*nors during their minority, and by limiting the right of action of a minor to recover immovables to 1 year after arriving at full age, where such prescription had accrued at the time of his reaching his majority.'"* (Italics ours.)

We further said in the course of the opinion in the Stubbs case:

"* * * We are also of the opinion that where, as in this case, *the minor married three years after the prescription pleaded began to accrue, her subsequent marriage did not interrupt the course of that prescription.* We fail to see what application the case of Arrington v. Gray, 161 La. 413, 108 So. 790, has to the facts of this case." (Italics ours.)

In the instant case, Effie Dexter Arnold was born on August 22, 1902, and became 22 years of age on August 22, 1924, long after the effective date (January 1, 1922) of Act No. 161 of 1920, which amended Article 3478 of the Civil Code. She instituted this suit on October 30, 1945, a little more than 21 years after her twenty-second birthday. Under these facts, if Calder or the Central Savings Bank & Trust Company had possession, prescription acquirendi causa ran against her during her minority, just as it did against the plaintiff in Stubbs v. Bain, supra, and her right of action to recover the property here involved was limited to the one year intervening between her twenty-first and twenty-second birthdays, since such prescription, based on the sale to George Calder on May 31, 1912, or

on the sale to the Central Savings Bank & Trust Company on August 11, 1915, as the case may be, had accrued at the time of her reaching her twenty-first birthday, and the plaintiff's marriage did not interrupt the course of that prescription. See Stubbs v. Bain, supra.

This brings us to the question of the possession of Calder and of the Central Savings Bank & Trust Company, which is one of the most controversial questions in the case. After the execution of the deed to Calder on May 31, 1912, by Walter, Louis, and Willie Dexter, Walter Dexter and his family continued to live on the property and farmed the land. By 1914 or early in 1915, all of the Dexters except Walter and his wife and family had either died or moved from the property. On February 13, 1915, Walter Dexter was sentenced to the penitentiary for a term of one year after conviction by jury on a charge of larceny. The Central Savings Bank & Trust Company filed its foreclosure suit against Calder on March 25, 1915, and acquired title by sheriff's deed on August 11, 1915. At some time between 1914 and 1916, the date thereof not being fixed by the testimony, Wisdom Johnson advised Ellen Dexter, wife of Walter Dexter, who was then incarcerated, that he, Johnson, had rented the property from George Calder, the owner. At the request of Johnson, Ellen Dexter and her children moved from the property, and Johnson took possession as a tenant of Calder and farmed the land for one year.

Eight witnesses gave testimony confirming in whole or in part the possession of the property by Wisdom Johnson in the name of Calder. It cannot be disputed, therefore, that Johnson did farm the land for a period of one year as a tenant for Calder, and that this possession was of such a character as to meet the requirements of the law, provided it occurred while Calder was still the record owner of the property.

The difficulty is that the record does not disclose the date of this possession, and as the record stands today, the preponderance of the evidence would indicate that this possession took place after the Central Savings Bank & Trust Company had acquired title by sheriff's deed. Daniel T. Phillips testified that he went on the property twice in 1917, and that "At the time I took it it was laying out but it had been farmed a year or so previous to that". This would fix the date at 1916 or 1915. Amanda White Shafer, who confirmed Johnson's possession in the name of Calder, gave no testimony with respect to the date. Archie Shafer, who also confirmed Johnson's possession, said, "I can't recall just what year." Tom Shafer testified that, when Walter Dexter went to the penitentiary, he left his wife and children on the property. This would fix the date of Johnson's possession, at the earliest, at some time after February 13, 1915. Ellen Dexter Jones, former wife of Walter Dexter, testified that she lived on the property a year after Walter Dexter went to the penitentiary, and that it was

in December, 1915, when Wisdom Johnson told her she would have to move off the place. Ed Dexter, one of the children of Walter Dexter and Ellen Jones, testified that he believed the family moved off the property in 1915. While he said it could have been in 1914, he stated, "In my judgment it was 1915; I am not sure but my remembrance is we left the same year he was put in jail, and that was 1915." He testified further, however, that his father went to the penitentiary in the fall. Isom Perry, who lived in the neighborhood and recalled Johnson's farming of the place for one year, could not fix the date of Johnson's possession, or the date Walter Dexter went to the penitentiary. George A. Koutezsky, brother of Mrs. Anding, when asked whether Johnson raised crops and ran an account at Bradley Brothers "along in 1914", answered, "Yes, sir; his account was guaranteed by John Bishop." Taking this testimony as a whole, we cannot say that the defendants have sustained their burden of proving that Johnson, as a tenant of Calder, possessed the property during the time Calder was the record owner thereof.

Defendants argue that, even if the date of Johnson's possession is not fixed, this is immaterial under the doctrine of precarious possession. They contend that the possession of the Dexters from May 31, 1912, until Johnson took possession for Calder, was the possession of Calder because a vendor is presumed to possess for his

vendee. It may likewise be contended that, if Calder through Johnson took possession after the Central Savings Bank & Trust Company acquired its title by foreclosure, Calder's possession through Johnson was possession for the bank under the same rule that a vendor is presumed to possess for his vendee.

In the solution of this problem, the following articles of the Civil Code must be considered:

Art. 3488. "As to the fact itself of possession, a person is presumed to have possessed as master and owner, unless it appears that the possession began in the name of and for another."

Art. 3489. "When a person's possession commenced for another, it is supposed to continue always under the same title, unless there be proof to the contrary."

Art. 3490. "The circumstance of having been in possession by the permission or through the indulgence of another person, gives neither legal possession nor the right of prescribing.

"Thus, those who possess precariously, that is, by having prayed the master to let them have the possession, do not deprive him thereof, but, possessing by his consent, they possess for him."

Art. 3556.

"25. Precarious.—That possession is called precarious, which one enjoys by the leave of another, and during his pleasure. * * *"

Art. 3441. "Those who possess, not for themselves, but in the name of another, as farmers, depositaries and others who acknowledge an owner, can not acquire the legal possession, because, at the commencement of their possession, they had not the intention of possession for themselves but for another."

Art. 3510. "Those who possess for others and not in their own name, can not prescribe, whatever may be the time of their possession.

"Thus, farmers, tenants, depositaries, usufructuaries and all those generally who hold by a precarious tenure and in the name of the owner, can not prescribe on the thing thus held."

Art. 3512. "Notwithstanding what is said in the two preceding articles, precarious possessors and their heirs may prescribe when the cause of their possession is changed by the act of a third person; as if a farmer, for example, acquires from another the estate which he rented. For if he refuse afterwards to pay the rent, if he declare to the lessor that he will no longer hold the estate under him, but that he chooses to enjoy it as his own, this will be a change of possession by an external act, which shall suffice to give a beginning to the prescription."

Art. 3433. "One may possess a thing not only by one's self, but also by other persons.

"Thus the proprietor of a house or other tenement possesses by his tenant, or by his

farmer; the minor, by his tutor; and, in general, every proprietor, by the persons who hold the thing in his name."

Art. 2480. "In all cases where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must produce proof that they are acting in good faith, and establish the reality of the sale."

The concept of precarious possession originated in the Roman law, where it was applied to those who possessed by the permission of the owner. It was later extended by the French law to include those who possessed for others by title, such as farmers, depositaries, borrowers for use, renters, and usufructuaries. Mourlon, Répétitions sur le code civil (2e ed. 1878), t. 3, no. 1843, p. 853; see Comment, 12 Tulane L.Rev. 608.

Aubry and Rau made this interesting observation on the subject:

"Under Roman law the term *precario possidere* designated the particular character of possession of the person to whom the proprietor or the possessor of a thing had delivered it, with permission to use it, but with the reservation of being able to claim its return at will. He who had received a thing *precario* possessed it *quoad interdicta,* in the sense that he enjoyed untrammeled possession as against everyone

with the single exception of the person from whom he had received the thing. His possession was thus tainted with only a purely relative vice.

"The qualification of *possessio precaria* had never been applied, under Roman law, to those who, like the usufructuary, the farmer, or the depositary, possessed not for themselves but for the account of another. It is only as a sequel to an erroneous notion of the character of *precarium,* and by a manifest confusion of ideas, that we have been brought, in our practice and even in the language of our laws, to apply the qualification 'precarious possession' to the simple possession of those who hold for others.

\* \* \* \* \* \*

"Simple possessors, in the sense of the Roman law, or precarious possessors, according to the terminology of French law, are those who, possessing a thing by virtue of an agreement or of a title as a result of which they are obliged to return it at the expiration of the term fixed in the agreement or upon the cessation of their title, hold for the account of another. Such are the usufructuaries, the farmers, the sequestrators \* \* \*." Droit civil Francais (5e ed. 1897), t. 2, no. 180, p. 123.

Since under the French law the concept of precarious possession applied where the possessor held by virtue of a title which obliged him to return the thing at a specified time, there was considerable controversy among the French commentators over whether the vendor who remained in

possession of the property of his vendee after the sale could be said to be a precarious possessor for his vendee.

Baudry-Lacantinerie said with respect to this controversy:

"Should the seller who does not deliver the thing to the buyer be considered, as to that thing, a precarious possessor, which would result in the impossibility of his prescribing the property? Thus, I sell you an immovable; you die before I have made delivery to you; your heir, who is ignorant of the sale, fails to claim the immovable during thirty years; then he discovers that a sale was made and brings an action in revendication against me. Can I plead prescription? As we have just said, this asks if my possession is by precarious title. If the affirmative is true, the action in revendication should prevail; it should fall in the contrary case.

"The question is controversial. According to some, the seller who keeps the thing is not a precarious possessor; he does not hold it by virtue of a title which obliges him to return it. [Citing Leroux de Bretagne, n. 394; Laurent, XXXII, no. 314; Huc' XIV, n. 373.] According to others, the seller who owes the duty of delivery and who continues in possession, detains the thing precariously; his juridical situation implies the obligation to deliver, and as a result implies precarious possession. [Citing Duranton, XXI, n. 243; Colmet de Santerre, VIII, n. 343 bis, II; Guillouard, 1, n. 470.]

"We can resolve the difficulty with the aid of a distinction. If the contract, expressly or tacitly, accords no term to the seller for the delivery, and if the vendor does not retain the thing by virtue of the right conferred by article 1612 of the Civil Code ['The seller is not obliged to deliver the thing if the buyer does not pay the price, and if the seller has not accorded him a delay for the payment.'], it cannot be said that he holds the thing by virtue of his title and for the account of the buyer, and thus precariously. He possesses it contrarily to his title and, as a result, without title, since his title obliged him to an immediate delivery; as a result, he possesses *animo domini* and, at the end of thirty years, prescription will have run in his favor.

"If, on the contrary, the contract expressly or tacitly accords a term to the seller for delivery, or if the seller keeps the thing by virtue of his right of retention, then it seems clear that the seller retains the thing precariously; for he possesses the thing by virtue of his title and very evidently for the account of the buyer, as to whom he recognizes the right of proprietor since he made the buyer the proprietor by the contract. This solution is incontestable in the case where the act recites that the seller will keep the thing until delivery in the character of a renter, farmer, depositary (art. 2236) or where the price is to be paid in ready cash, in which case the seller keeps the thing until payment is received by virtue of his right of retention. But it

would seem that the principle should be applied even when the contract does not indicate the title by which the seller is authorized to keep the thing; it was necessarily understood that he would possess the thing precariously, since, by the very title which authorizes him to detain, the seller recognizes the right of proprietor in the buyer. [Citing Bufnoir, p. 213.]" Baudry-Lacantinerie et Tissier, Traité de droit civil (3e ed. 1905), "De la préscription", t. 28, no. 306, p. 238.

Mourlon, who held that the concept of precarious possession did not apply as between vendor and vendee in the absence of a particular clause in the contract of sale as to the time of delivery, conceded that the majority view was to the contrary. He said:

"Must we consider as precarious possessors those who, after having alienated a thing, do not deliver it to the buyer but continue to enjoy it themselves? I put my question more precisely: Paul died after having paid to me the price of an estate which I sold him; his heirs, who are ignorant of the sale, do not demand execution; I remain possessor of the estate; I enjoy it for thirty years without reclamation on their part. Has prescription run to my profit? Have I acquired, by that possession of thirty years, the immovable which I had sold?

"The question depends on the solution of this one: Does the seller who has not delivered the thing sold possess it *precarious-*

*ly,* that is to say in the name of and for the account of the buyer? Or does he possess it *animo domini,* that is to say *cum animo rem sibi habendi?* If he is considered a precarious possessor, prescription does not take place; on the contrary prescription can take place if we decide that he possesses for himself and not for the buyer.

"Where it is agreed, by a particular clause of the contract, that the seller, for a certain period, will conserve the property under title of renter, farmer, or depositary, it is evident that he holds it precariously, in the name of and for the account of the buyer, and that thus he cannot prescribe. But is the decision to be the same in the case of a contract which contains no clause of this type?

"The affirmative is generally sustained. The reasoning is thus:

" 'Holding a thing precariously is to hold it in a quality which implies the obligation to return it to its rightful owner; this obligation to return is precisely that which stamps the possession as precarious, that which puts an obstacle to prescription. The seller who does not deliver the thing sold retains it in a capacity which implies the obligation of delivering it to the buyer; therefore he possesses precariously; therefore he cannot prescribe.'

"I do not think this solution a good one. I admit, for the present, the principle on which it is engrafted. Yes, I would say, that person is a precarious possessor who

holds a thing by virtue of a title which obliges him to return the thing to the person from whom he got it. But that rule is not applicable to our hypothesis. If the seller possessed *in his quality as seller,* that is, by virtue of the title of sale which obliges him to deliver the thing to his buyer, the majority view which I combat would be irreproachable. But does the seller really possess by virtue of his title of sale? Is it true that it is the sale which is the cause of his possession? No one would sustain this contention. He is held obliged, without doubt, to deliver the thing to the buyer; but his obligation does not spring from the title of his possession, since he possesses without title." Mourlon, op. cit. supra, t. 3, no. 1844, p. 853.

There are two leading cases in Louisiana which consider the question. In Roe v. Bundy's Heirs, 45 La.Ann. 398, 12 So. 759, 763, this court applied the concept of precarious possession to the case of a vendor who remained in possession of the property of his vendee, reaching this conclusion by the following line of reasoning:

"In view of these express articles of our Code declaring that until delivery the seller must *take charge of the property as a good administrator,* (provisions of law, which, as we have said, must be considered as part of the contract), we are bound to consider that in the interval of time between the sale and the delivery the seller holds the property for the buyer. His *'detention'* is his vendee's 'possession,'

(for it is impossible for two persons to possess the same property at the same time, each for himself); and, charged as he is with a duty to his vendee by law, and in one sense, therefore, by *contract,* he falls squarely under what Laurent even considers the conditions necessary to constitute 'precarious possession.' There is no evidence in this record to show that Greene ever performed his obligation of delivery. Under the pleadings we are bound to accept as true the very reverse."

But in the later case of Succession of Zebriska, 119 La. 1076, 44 So. 893, 897, this court, through Justice Provosty, held that the question of whether the continued possession of the vendor has been for himself or for his vendee is a question of fact. We said in that case:

"The question of whether the continued possession of the vendor has been for self or for another can become a question of law only from the point where it ceases to be a question purely of fact; that is to say, where the evidence leaves it doubtful whether the possession was or not for self, as where the possession which existed before the sale has simply continued, with no outward sign of whether from and after the sale it was for the vendor or the vendee. In such a case the law may step in and decide the matter by a legal presumption. The natural inference in such a case would be that the vendor had continued in possession only by sufferance and with the tacit understanding that he would yield to the

vendee on demand. And that is the view taken by the common law, which we find stated in 1 A. & E.E. 818, as follows:

" 'Possession of Vendor.—Though the mere continued possession of the vendor of land, after conveyance executed, is not adverse to his vendee, or one claiming under him, yet there is nothing in their relations which will prevent the vendor from acquiring a title by adverse possession; and if the intention to hold adversely is manifested by some unequivocal act of hostility, brought to the knowledge of the vendee, the statute of limitation will begin to run.' "

In distinguishing the case of Roe v. Bundy, supra, we went on to say:

"The decision in the case of Roe v. Bundy, 45 La.Ann. 398, 12 So. 759, invoked by the city, has no application under the facts of this case. In that case the vendor had continued in possession. That fact not only was not denied, but was expressly alleged, by the plaintiff, and the court, in deciding the case, laid stress on the peculiarity of the pleadings; and the court also emphasized the fact that there was nothing to show what had been the character of the possession after the sale whether as owner or otherwise. True, the syllabus is broadly to the effect that 'a vendor, until delivery to his vendee, occupies the position of a precarious possessor. His detention of the property sold is the vendee's possession of the same.' But that syllabus is broader than the facts of the case called for. There was nothing in the facts of the case to show whether the possession of the vendor after the sale had been in point of fact as owner, or by mere sufferance.

"The case at bar can be and is decided on its facts, and hence the question of what is the judgment of the civil law on a case where the continued possession of the vendor is unexplained need not be gone into; but the writer of this opinion, without discussing the point, and merely as the expression of his own individual view, upon which the court is not called upon to express itself one way or the other, will add that in his opinion the decided weight of civil law authority is to the effect that such unexplained continued possession of the vendor is presumed to be for himself, and he will add, further, that by textual provision of the Code delivery of possession accompanies the notarial act of sale of immovable property, and that consequently under our Code such a thing as a notarial sale of immovable property without delivery is an impossibility."

The individual view expressed by Justice Provosty was, of course, as stated by him, not the opinion of the court, and our review of the writings of the French commentators convinces us that the opinion of the majority of these commentators does not support his view. We hold to the view that, when the continued possession of the vendor is unexplained, as to third persons there is a presumption of simulation, Civil Code, Article 2480, and as between the parties the unexplained continued

possession of the vendor is presumed to be for the benefit of the vendee. Civil Code, Articles 3433 and 3489. But, where a vendor is not in actual possession at the time of the sale, or where he is in possession at that time, and surrenders possession to his vendee, and where, in either of such cases, the vendor later takes or re-takes, as the case may be, possession of the thing sold, the unexplained possession of the vendor thereafter, in either case, is presumed to be for himself, as owner, and not for the benefit of his vendee. However, all of these presumptions may be rebutted. Civil Code, Articles 2480, 3512, and 3488. In both Roe v. Bundy and Succession of Zebriska, both cited supra, it is conceded that a vendor may possess adversely to his vendee and reacquire the property he has sold by the prescription of 30 years. In Roe v. Bundy, supra, we said:

"Coming to the consideration of the question as to whether the vendor of property is *absolutely* precluded from acquiring title to the property conveyed by him to his vendee, adversely to that vendee, by the prescription of 30 years, we find that the weight of authority, both under the civil and common law, is decidedly in favor of the proposition that he is not estopped from doing so, and that the differences among commentators and courts on this subject have been principally as to the time, circumstances, and conditions under which such acquisition can be made and claimed, and under and by what evidence it

can be proven. The common-law decisions will be found in the *American and English Encyclopedia of Law* under the title of '*Adverse Possession.*'

\* \* \* \* \* \*

"Now, assuming that Greene, before he had performed that duty, could place himself in a position of hostility to his vendee [vendor], and could through some positive act of his own, which the French commentators speak of as an '*acte de contradiction*,' change the character of his possession from that of its origin, and be entitled to alter it by an 'interversion of possession,' we would certainly require of him, for the purpose of acquiring the property by the 30-years prescription, that he should clearly establish that *knowledge* of this change of position had been brought home by him to his vendee. This proof, as we have said, has not been made."

In Succession of Zebriska, supra, we said on the same subject:

"In the case of Roe v. Bundy's Heirs, 45 La.Ann. 398, 12 So. 759, this court said that the vendor is not precluded from reacquiring by prescription the property he has sold.

\* \* \* \* \* \*

" \* \* \* The question of whether a vendor has continued in possession for himself or another is primarily a question purely of fact. Whether one's possession is for self or for another is primarily a question of fact. Where the evidence is unquestionable

one way or the other, there can be no controversy. If, for instance, the evidence showed that as soon as the sale had been completed the vendor had notified the vendee that he would not surrender possession, but would continue to hold the property in his own name and for his own account; and if, in pursuance of that notice, he had for 30 years thereafter continued said possession, resisting every effort of the vendee to oust him—there could be no question but that he had possessed in his own name and for his own account, and not in the name of and for the account of the vendee, and there could be no question but that the prescription of 30 years would apply. In such a case the only action the vendee would have had for enforcing his rights under the sale would have been an action for immovable property; and by article 3548, Civ.Code, 'all actions for immovable property are prescribed by thirty years.' In such a case, to say that the vendor was holding for the vendee would be simply to make an assertion contrary to the facts; and to say that the prescription of 30 years did not apply would be simply to legislate out of existence for that particular kind of action the prescription of 30 years."

The other cases cited by counsel on both sides throw no additional light on the problem.

In the instant case, therefore, the question of whether the vendors, Walter, Willie, and Louis Dexter, after the sale to Calder on May 31, 1912, intended to possess the property for Calder or for themselves is primarily one of fact. Likewise, if Wisdom Johnson as a tenant for Calder went into possession of the property after the Central Savings Bank & Trust Company became the owner thereof, we must first look to the facts to determine whether Wisdom Johnson's possession was for the bank or for Calder as an adverse possessor to the bank. Only in the absence of facts must we apply the presumptions of law. The presumption of simulation under Article 2480 of the Civil Code will not apply in this case because the family of Walter Dexter was evicted from the property by Calder through his tenant, Johnson, and Walter Dexter, after his release from the penitentiary, made no effort whatsoever to regain possession of the property. Likewise, Wisdom Johnson remained in possession of the property for only one year, and, after he left, Calder made no effort to claim possession of the property from the Central Savings Bank & Trust Company, which had taken the property away from him by foreclosure. In the case of the continued possession of the Dexters after the sale to Calder, the only testimony in the record with respect to the character of their possession is that of Ellen Dexter Jones, former wife of Walter Dexter, that her husband owned the property, that they paid rent to no one, and that they possessed as owners and not as tenants of Calder. If it be a fact that Wisdom Johnson went into possession of the property after the Central Savings Bank & Trust Company

became the owner thereof, the record is devoid of any evidence from which we can determine whether Johnson as tenant for Calder possessed for the bank or adversely to it. In connection with the possession of Walter Dexter, there is another problem to be considered, concerning which the record is also devoid of facts. At the time that possession began, Walter Dexter and Effie Dexter Arnold were co-owners of the property to the extent of one-half each. Co-owners or owners in indivision possess for each other and cannot acquire title to property by prescription as against each other unless the possession is clearly proved to be hostile. Liles v. Pitts, 145 La. 650, 82 So. 735. Such possession of one co-owner for another is not converted into adverse possession by the mere execution and registry of a sale of the property. In Moore Planting Co., Ltd., v. Morgan's Louisiana & T. R. & S. S. Co., 126 La. 840, 53 So. 22, 35, we said:

"Such excerpts as these—all in the same sense—could be multiplied almost indefinitely. . From them it is very plain that for a precarious possessor, such as a usufructuary or the holder of a servitude, to change the cause of his possession and inaugurate a new possession, it does not suffice for him to acquire and record a new title; but that he must, in addition, indicate by some outward acts of possession his intention to hold no longer under the old title but under the new; and that these acts must be of an unusually pronounced character.

He must so conduct himself as to let the owner know that a new order of things has begun. In the same way that prescription liberandi causa is founded upon a presumption of payment, prescription acquirendi causa is founded upon a presumption of acquiescence on the part of the owner in the claim of title set up by the possessor; and the owner of property cannot be presumed to have acquiesced in a claim of ownership of which he is in total ignorance. He cannot be presumed to have known that the possession which theretofore had been precarious has suddenly become animo domini, when there has been absolutely nothing in the manner of the possession to indicate the change. The registry of the new title is not notice to him. It is as to him res inter alios acta. He has no concern with it. A man who is in the quiet and peaceable possession and enjoyment of his property does not have to be inspecting the public records every day, or every month or every year, or, for the matter of that every 10 or 30 years, to find out if somebody has not been recording title to his property. Until his possession is disturbed he does not have to concern himself with any claims that other people may be recording against his property. Registry is for the benefit of those who wish to contract with reference to property—to inform them of the condition of the title to the property with reference to which they are about to contract, and was never designed to operate as a means of disturbing or ousting the possession of the owner of the property. * *"

With the record in the instant case in its present state, we do not believe that there are sufficient facts before us to justify us in ruling on the plea of prescription of 10 years acquirendi causa based on either the Calder deed or the deed to the Central Savings Bank & Trust Company. Because of the inadequacy of the evidence in the record with respect to the possession of the property between May 31, 1912, and December 30, 1916, and because it is obvious that neither the plaintiffs nor the defendants explored this question fully in the trial below, we believe the case should be remanded to the district court in order that further evidence, if any is available, may be produced on this point. If, after the available evidence is presented, the defendants are able to establish that Johnson's possession in the name of Calder was at a time when Calder was the record owner of the property, the plea of prescription of 10 years must be sustained. Likewise, if it should be established that Johnson's possession for Calder took place after the Central Savings Bank & Trust Company became the owner of the property, and defendants are able to establish that this possession was with the express permission and approval of the bank and for its benefit, and not adverse to it, the plea should be sustained. Moreover, if it can be shown as a matter of fact that Walter, Willie, and Louis Dexter possessed for, and not adversely to, Calder or the Central Savings Bank & Trust Company, as the case may be, and that Effie Dexter Arnold was properly put on notice of the change in the character of Walter Dexter's possession, the plea should also be sustained. Otherwise, the plea of prescription of 10 years acquirendi causa must be overruled, and judgment rendered for plaintiffs.

In the event of a final judgment for plaintiffs, there is one remaining question to be considered. Defendants Charles H. Murphy, Jr., and Sun Oil Company contend that they took their lease from the record owner of the property, Mrs. Elizabeth K. Anding, and that, as innocent purchasers on the faith of the public records, they are not bound by facts dehors the public records. They point out that the tax sale is a valid sale in every respect on the face of the records, and that the act of partition in which Mrs. Elizabeth K. Anding acknowledged that the property belonged one-half to herself and one-half to her children, was not executed and recorded until after the execution of their lease. They contend that, even if the tax sale is a simulation as between the parties, their rights would not be affected under the doctrine of the case of Bell v. Canal Bank & Trust Co., 193 La. 142, 184 So. 382, 187 So. 295, 190 So. 359, 363, where we held:

"The jurisprudence is clear under the law of registry that a purchaser of real estate in good faith from the owner of record and without notice cannot be affected by latent equities and secret rights which may have existed in favor of former owners of the

property dehors the public records. [Authorities.]

"The law is well settled that a third person can acquire a good title to immovable property from the owner of record, even though he has been apprised of the equities or rights of others in the property that did not appear of record, in accordance with the law of registry. [Authorities.]

"The Prudential Insurance Company of America, having been granted a mortgage on the property on April 16, 1927, to secure the note of $1500, which sum of money it advanced to Dr. Houston L. Staring, who was the sole and only record owner of the property—and there being nothing registered or recorded in connection with the title to show any defects therein or equities or rights of Manuel Bell, Sr., or his heirs, the Insurance Company, as a third party, relying upon the public records and the law of registry is protected against latent rights and secret equities of former owners dehors the record. The Canal Bank & Trust Company, in Liquidation, having purchased, in due course of business, the note secured by the mortgage, without any knowledge or notice of the claims or rights of the heirs of Manuel Bell, Sr., certainly acquired the same rights obtained by the Prudential Insurance Company of America in the mortgage and the note."

But the ruling in the Bell case and in the other cases relied upon by the mineral lessees has application only where the third person, relying upon the faith of the public records, purchases the immovable or acquires a real right therein. It has no application to the case of a lessee, whose rights are strictly personal and who has no greater rights than those of his lessor. In Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846, we held that the usual oil and gas lease with a cash or royalty consideration, or both, such as the one presently before us, is a contract of letting and hiring within the meaning of the codal articles, and that the lessee in such a mineral lease obtains an obligatory or personal right only, and not a servitude on the realty or a real right in the land.

In Tyson v. Spearman, 190 La. 871, 183 So. 201, 208, the mineral lessees made the same contention as they do in this case. In that connection we said:

"But counsel for the defendant, the United Gas Public Service Company, contend that it acquired the lease on the property from the record owner on the faith of the public records, and the plaintiffs having knowingly allowed the Gibson children to remain in possession of the estate of Louisa Gibson as owners and to sell the same as owners to N. S. Spearman and W. R. Spearman, that they are estopped under the provisions of Article 1839, and en pais from contesting its rights as lessee under its contract of lease.

" 'It is the established jurisprudence of this state that the lessee in the usual oil and mineral lease merely obtains a personal

right and not a real right in the property' (Marchand v. Gulf Refining Co. of Louisiana, 187 La. 1002, 175 So. 647, 649. See, also, Sabine Lumber Co. v. Broderick, 5 Cir., 88 F.2d 586; Posey v. Fargo, 187 La. 122, 174 So. 175), and his possession being for another (his lessor) does not thereby acquire rights for himself. On the contrary, such rights as the lessee may have acquired by virtue of his possession inures to the benefit of his lessor."

The adoption of Act No. 205 of 1938 has not altered this situation. We have consistently held that that act is remedial and procedural in character, and that it has not affected or changed any of the substantive rights flowing from the execution of mineral leases. Allison v. Maroun, 193 La. 286, 190 So. 408; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336; Amerada Petroleum Corporation v. Reese, 195 La. 359, 196 So. 558; Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473. We did not depart from that view in Davidson v. Midstates Oil Corporation, 211 La. 882, 31 So.2d 7, where we held that, under Act No. 205 of 1938, mineral leases must be in writing and cannot be proved by parol evidence. Our ruling in that case was limited to matters of form and did not include matters of substance. We did not hold in that case that there was any change in the substantive rights of the parties to a mineral lease as a result of the adoption of Act No. 205 of 1938.

In support of their contention that the rule that third persons can acquire good title to immovable property from the owner of record applies to mineral leases, counsel for Charles H. Murphy, Jr., and Sun Oil Company cite the cases of Baird v. Atlas Oil Co., 146 La. 1091, 84 So. 366; Braswell v. Columbia County Development Co., 153 La. 691, 96 So. 534; Jefferson v. Childers (Querbes, Intervener), 189 La. 46, 179 So. 30; English v. Blackman, 189 La. 255, 179 So. 306, and Angichiodo v. Cerami, D.C., 28 F.Supp. 720. All of these cases, except the federal case, were decided before Tyson v. Spearman, supra. In Baird v. Atlas Oil Co., supra, it was said:

"However, the conveyance records are the only thing to which one dealing with real estate or any real right thereon needs to look, under the repeated decisions of this court; and one seeking to acquire a subsequent mineral lease upon property to which the right had been previously conveyed would only have to inquire and inform himself as to the status of the person's claims in whose name the property stood at the time he sought to deal with it. * * *" [146 La. 1091, 84 So. 369.]

This decision, which treated the rights of a mineral lessee as real rights rather than personal rights, has been impliedly overruled by our decisions in Gulf Refining Co. of Louisiana v. Glassell, supra, and Tyson v. Spearman, supra. This is likewise true of the decision in Braswell v. Columbia County Development Co., supra. The

case of English v. Blackman, supra, was decided after Gulf Refining Co. of Louisiana v. Glassell, supra, but before Tyson v. Spearman, and the ruling is based on the erroneous conclusion reached in Baird v. Atlas Oil Co., supra, which has been impliedly overruled by Tyson v. Spearman. The decision in Jefferson v. Childers, supra, was based on the plea of estoppel, but, if there was anything said in that decision which is contrary to what was said in the later case of Tyson v. Spearman, the latter decision necessarily prevails. The decision in Angichiodo v. Cerami, supra [28 F.Supp. 722], by the United States District Court for the Western District of Louisiana, to the effect that "An oil and mineral lease, or a royalty interest, is an interest in real property and is governed by the same rule, as that which governs property rights", was based on our earlier jurisprudence. Cf. Lawrence v. Sun Oil Co., 5 Cir., 166 F.2d 466.

Mineral leases must be construed as leases, and the codal provisions applicable to ordinary leases must be applied. See Tyson v. Surf Oil Co., and Coyle v. North American Oil Consolidated, both cited supra. Accordingly, since Murphy and Sun Oil Company have no greater rights than those of their lessors, their co-defendants herein, they must be held to an accounting to Effie Dexter Arnold to the extent of her interest in the event of a final judgment in favor of plaintiffs.

For the reasons assigned, the judgment of the district court is reversed, and the cause is remanded for further proceedings in accordance with the views herein expressed.

Costs of this appeal as well as all other costs are to await the final disposition of this cause.

HAMITER and HAWTHORNE, JJ., dissent and assign written reasons.

O'NIELL, C. J., recused.

HAMITER, Justice (dissenting).

The acquisitive prescription plea of ten years, in my opinion, should be sustained. Indisputably Calder's possession through Wisdom Johnson occurred prior to December 30, 1916, the date on which the Central Savings Bank & Trust Company secured the abstract of title (disclosing the outstanding interest) and became in legal bad faith. If the possession commenced before the divestiture of Calder's title by the sheriff's sale, it is conceded by the majority that the plea of prescription is well founded. If it occurred thereafter, on the other hand, the presumption is that Calder possessed for his vendee (the bank), and such presumption, since there is no evidence to overcome it, is controlling and must be given effect.

I respectfully dissent.

HAWTHORNE, Justice (dissenting).

The majority opinion has concluded that James L. Anding, Sr., was in legal bad faith at the time he acquired the property on January 4, 1919. I have serious doubt as to the correctness of this conclusion, but, assuming it to be correct, I am still, as I have been from the beginning, of the opinion that the 10 years' prescription acquirendi causa, based on the sale to Calder on May 31, 1912, is well founded and should have been sustained, and plaintiffs' suit dismissed.

This case has been argued in this court three times. After each of the first two arguments, a sufficient number of the six members of the court participating in this case could not agree so that an opinion and decree could be rendered, and it has been only since the third and final argument that the majority has concluded to remand the case so that additional evidence may be adduced as to the date and the nature of the possession of George Calder and Wisdom Johnson, who possessed the property as Calder's tenant.

The possession of these parties was not an issue in the lower court, nor was it an issue during the first two arguments in this court. This is clearly shown by plaintiffs' original brief, pages 75 and 76, filed in this court on April 24, 1948, from which I quote:

"Under these circumstances, Anding was not a purchaser in good faith and so the deed to him by Phillips cannot serve as the basis of the prescription of ten years acquirendi causa; nor could Mr. Anding tack on, or use, *the possession of earlier vendors in his chain of title* because he was not, himself, a purchaser in good faith. Ten years had not yet accrued from the time of the purchase by Calder to the time of the sale to Anding, so *there is no need to discuss the earlier possession and titles."* (Italics mine.)

On the other hand, defendants from the inception of the case have urged that the plea of 10 years' acquisitive prescription was well founded, based not only on the acquisition of the Central Savings Bank & Trust Company and Anding, Sr., but also on the acquisition of George Calder. Notwithstanding this plea of prescription, which squarely raised the issue of possession, the nature and date of the possession of Calder and Johnson were not questioned by plaintiffs until now. This, in my opinion, clearly shows that this issue was raised as an afterthought. Until this time, plaintiffs pitched their entire case on the bad faith of Anding, Sr., and the illegality of the tax sale to Anding, Jr., and their position was tantamount to conceding, and correctly so, that George Calder's possession was sufficient to start the running of the 10-year acquisitive prescription, under the established facts, but that Anding, Sr., could not acquire thereunder because he was in bad faith.

I have been of the opinion from the first argument of this case that Calder had the necessary possession to begin the acquisitive prescription of 10 years. The fact is established conclusively and beyond any question that Wisdom Johnson went on the property for Calder as his tenant and farmed the property for him for one year. Because the witnesses after some 30 years could not state definitely when the Dexter family was evicted and Wisdom Johnson went on the property (but all of them who testified on the point testified that it was either 1914 or 1915), the majority of the court entertains enough doubt of Calder's possession, and of whether Johnson went on the property while Calder was the owner, to imagine numerous possibilities as to the character of his possession, which in turn raise infinite problems of precarious possession, presumptions, and counter-presumptions, and finally to remand the case with a myriad of instructions to the trial judge as to the proof that can be offered, the regulation of the order of the proof, and the effect of it. This part of the opinion is a scholarly treatise on the subject of precarious possession, but none of it, in my opinion, is necessary for a decision in this particular case. Furthermore, in my opinion the record itself shows that remanding the case is a vain and useless thing. The events on which further evidence is to be taken occurred more than 30 years ago; the record in this case, besides the numerous exhibits, already fills seven volumes, and the fact of Calder's possession has been fully explored.

Is the fact that the witnesses were indefinite on the question of the exact time of Wisdom Johnson's tenancy actually as important and decisive as the majority of the court has concluded? I am of the opinion that it is not. In the first place, as set out above, the witnesses were testifying as to matters that occurred some 30 years before. That they should be indefinite, or even contradict one another on the point after such a long time, is not unusual, but the assumptions that the majority of the court has made from this are most unusual.

To reach the decision in this case the majority has made the unreasonable assumption that Calder might have arbitrarily sent in his own tenant after the bank foreclosed on him without any understanding with the bank as to the matter—and, further, that the bank could have managed its affairs so poorly that it would have allowed the persons on the property at the time of the foreclosure (the Dexters) to remain four months after the foreclosure (from August to December of 1915) and then would have permitted the former owner, Calder, to send in his tenant, Wisdom Johnson, to possess openly and notoriously for him, and adversely to the bank. By these assumptions and views the majority completely loses sight of the real issues in this case, and even who are the parties to this suit. This is not a contest between any of the vendors and vendees in Anding's chain of

title; this suit is an attack on the whole chain of title by a third person. There is not one inference, suggestion, or hint in the entire record that any of the vendors in the chain ever had the remotest idea of possessing adversely to his vendee.

I am not unmindful of the rule that he who urges prescription must prove it. If there were any doubt in this record that there was actual, physical possession of the land or that such possession was for Calder, the contention that the pleaders of prescription had failed in their proof would be valid, but the record establishes conclusively that there was actual possession—farming of the land by Wisdom Johnson—, and that it was for Calder, as Calder's tenant. Certainly, under these circumstances, if any presumption is to be indulged in here, it should be the presumption that Calder sent his tenant on the property while he was owner. Presumptions are reasonable conclusions or natural inferences drawn from certain proven facts. It is the natural thing that a man would lease property and send a tenant on it while he is the owner; to do so when he is not the owner is an unusual and unnatural act. Since the record does not show that the unnatural act was proven so that the presumption would be overcome, I am of the opinion that the necessary possession was established, and that the plea of prescription of 10 years acquirendi causa should be sustained.

I respectfully dissent.

On Rehearing

FOURNET, Chief Justice.

Effie Dexter Arnold, being out of possession, instituted this petitory action to have herself declared the owner of an undivided half interest in the SE¼ of the SW¼ of Section 14 and the NE¼ of the NW¼ of Section 23, T. 17 N., R. 9 E., Richland Parish, Louisiana. She was joined in her suit by Robert B. Prentice and Murray Hudson, the holders of a mineral lease and royalty deeds executed by her. They seek to have recognized the interest in the property conveyed to them by these instruments.

The defendants are the heirs of Mr. and Mrs. James L. Anding, Sr., and of James L. Anding, Jr., who claim the full ownership of the property, subject to the rights held by their mineral lessees, Charles H. Murphy, Jr., and the Sun Oil Company.

This case has become a celebrated one in the court. The petition was originally filed on October 30, 1945, and the trial in the lower court covered a period of almost two years, the appeal not being lodged here until October 18, 1947. The case was first argued in this court on April 26, 1948, but no decision was handed down for the reason that the judge to whom it was assigned was unable to secure the requisite number of adherents to his views. Only five judges heard that argument, the then Chief Justice, Charles A. O'Niell, having been recused, and the vacancy caused by the

death of Justice Bond not having been filled. The case was argued a second time on October 5, 1948, before a six-man court, but no decision was rendered because the court was evenly divided in opinion. The third argument was heard on February 15, 1949, before a seven-man court composed of the six regular members and a judge ad hoc who was called to sit in the place and stead of Judge O'Niell, recused. The case was assigned to this judge and he handled the matter so ably his opinion bore the signature of four of the other judges, only two dissenting. When the applications for rehearing filed by both the plaintiffs and the defendants were considered in consultation it was originally intended that the rehearing be limited to the question of remanding the case for the introduction of further evidence, raised by the plaintiffs, and to the nature and extent of the protection to be accorded the rights held by Murphy and the Sun Oil Company, allegedly acquired by them in reliance on the public records. However, because of the importance of the case and the many vital issues presented, it was concluded that justice could best be served by opening the case in its entirety and it was, therefore, argued for a fourth time on January 9, 1950, without restrictions of any kind.

During all of the time the case has been pending in this court the record, though somewhat voluminous, has been read and studied, at one time or another, by almost all of the court personnel, with the result

that although we are very familiar with the complicated facts involved and appreciate their full significance, as well as the unusual part they play in the casting of the issues, we may have inadvertently overlooked the fact that others cannot correctly appraise the pleadings and our conclusions with respect thereto unless they have complete knowledge and understanding of the background. For this reason we are giving in great detail the facts and history of the case, as reflected by the record, in chronological order.

The 80 acres in question form a part of a larger tract that was entered by Thomas Curry and Rice Garland on June 7, 1853, under a certificate issued by the United States government; it was officially severed from the public domain when the government subsequently patented the property to them on June 5, 1857. The property forming the basis of this suit was dismembered from the original tract and transferred, eventually finding its way into the hands of Hiram R. Lott, by instruments which are in the record but need not be discussed for the reason that they have no effect on the controversy here. On December 9, 1875, Lott sold the property to Mariah Dexter for $133 in cash and a mortgage of $66, represented by 2 notes of $33 each. She is the common ancestor in title of the plaintiffs and the defendants.

Mariah Dexter, though "purchasing and accepting for herself," was then married to Boston Dexter and was authorized by

him to enter into the contract. The property fell into the community existing between them. They moved onto the property with their two children, Lula—who was born in 1874 and died unmarried in 1900 leaving two illegitimate children, Willie and Louis Dexter—and Lee, who was born the year the property was acquired and died two years later while still in infancy. Lula and Lee thus pass out of the picture, though the illegitimate children of Lula play a part that will be discussed later.

After Mariah and Boston Dexter moved onto the property (lying to the south of Delhi, Louisiana, in what was then a small colored community), their two remaining children were born, Walter in 1877 and John Henry in 1883. Around 1900 Walter married Ellen, whose maiden name is not disclosed by the record, and they moved into one of the three cabins then on the place (Mariah lived in one and her mother-in-law in the third), where their four children were born. In January of 1901 John Henry Dexter married Eliza Hedgman and they moved into a fourth cabin on the property that was built especially for them. There, in August of 1902, their daughter, Effie, who is the principal plaintiff in this case, was born. When Effie was only a few years of age Eliza died, leaving the small child in the charge and care of Amanda White (daughter of Warren White, a son of Mariah Dexter but not of Boston) who had been helping Eliza during her illness. Moving away from the

community some three or four years later with Effie, Amanda White settled in Delhi, where she lived on the premises and cooked for many years for Judge Buchanan, a next door neighbor of the Andings. In the meanwhile, Mariah having died in 1905 at the age of 69, Boston in 1907 or 1908 around 70 years of age, and John Henry in 1909 at the age of 26, Walter Dexter and his family were the only members of the Dexter family left on the property, with the possible exception of the illegitimate children, Willie and Louis Dexter, the record being indefinite as to their whereabouts or movements.

Around 1895 James L. Anding, Sr., a native of Hazelhurst, Mississippi, then of school age, began spending his summers in Delhi, Louisiana, visiting in the home of Dr. J. M. Barrier, whose wife was Anding's double first cousin; and graduating from high school in 1900 he settled permanently in Delhi that same year, marrying Elizabeth Koutezky, a native of Delhi, in 1903 or 1904. In 1906 Anding, who had worked in various stores for other people, went into the mercantile business for himself, trading to a large extent with the colored people of this small country town, including the Dexters and those who lived in their immediate community. The witnesses for the defendants testified that Anding, like many of the men in Delhi (and also George Calder), hunted around in the vicinity of the Dexter property during the seasons, possibly even with some of the Dexter

men, frequenting the settlement also on Sundays to witness the baseball games played there by the colored people.

After his marriage, Anding lived first with an aunt of his wife and then in one or two other places that burned, the dates and location thereof not being clear. In 1909, however, when Amanda White moved onto the Buchanan place in Delhi proper, bringing with her Effie Dexter, then about seven years of age, Anding was living next door to the Buchanans in a house that he had built. He continued to live in this same house until his death in 1928. His five children were all born in Delhi and they grew up in the house next door to the Buchanans. These are: James L. Anding, Jr., born in 1905; Mary Jane Anding Hopson, born in 1907; Corre Buchanan Anding Whitfield (named for the wife of Judge Buchanan), born in 1910; George K. Anding, born in 1911; and Elizabeth Virgil Anding Thompson, born in 1915.

The estates of Mariah and Boston Dexter were never opened so their heirs were never legally placed in possession of this property. There is nothing in the record to show in whose name the property was assessed during this time but there is evidence that in 1910 it was assessed in the name of "Mariah Dexter, Est. of," for the taxes for 1910; and these remaining unpaid, the property was sold on March 6, 1912, to J. W. Jones for $21.80, the amount of the taxes due for 1910 plus interest and costs. On May 31, 1912, shortly after this tax adjudication to Jones, Walter, Louis, and Willie Dexter conveyed to George M. Calder by notarial deed their "rights and titles and interests" in and to the SE/4 of the SW/4 of Section 14 and the NE/4 of the NW/4 of Section 23, T. 17 N., R. 9 E., the property involved in this case, for the price of $121.68 (the property was at that time assessed for $320), it being specifically stated in this deed that the taxes for the year 1911 had been paid, without any mention of the taxes of 1910 for which the property had only shortly before been sold to Jones. This is the deed under which the Andings and the other defendants claim title to the property.

Willie and Louis Dexter, of course, had no interest whatever in this property, being the illegitimate children of Lula Dexter, who had died unmarried in 1900. And Walter Dexter owned only a half interest in the property, the other half being the property of his niece Effie, the daughter of his brother John Henry Dexter, then a minor about 10 years of age. Walter Dexter purported to act as the representative of Willie Dexter in this transaction, although there is no power of attorney or authorization from Willie Dexter that is made a part of or attached to this instrument. George M. Calder, a resident of Richland Parish, was purportedly acting as the agent of George Calder (a cousin who was a cotton buyer and lived in Vicksburg, Mississippi) in the transaction, and

although there is a power of attorney attached to the instrument authorizing George M. Calder "to accept a Deed, from Walter, Louis and Willie Dexter," that is dated May 31, 1912, the date of the deed, this power of attorney was not signed and notarized until some two weeks later, in Vicksburg, Mississippi, on June 12, 1912.

The day after this deed was executed by the Dexters, the property was redeemed from J. W. Jones upon the payment to him of $26.16, and the release executed by Jones at Rayville, Louisiana, states this amount was paid to him by "Mariah Dexter Est."

George Calder did not himself, and neither did his agent George M. Calder, ever take actual physical possession of the property. In fact, Walter Dexter, with his family, remained on the old home property until he was charged with a crime and, after trial, sentenced to the penitentiary in February of 1915, paying no rent to the Calders in either money or crops. (Walter never returned to the property, and died in 1944.) The only physical possession Calder could have had of this property was through the tenancy of one Wisdom Johnson who, it is inferred, was sent to farm the property—by which of the Calders is not clear. It is claimed by the defendants in this court, though no effort whatsoever was made by them to introduce any proof in support thereof in the lower court, that Johnson, as the tenant of Calder, took possession of the property in the fall of

1914 by putting the wife and children of Walter Dexter out of the only cabin left standing on the place and off of the property. The record as presently made up, however, is overwhelmingly indicative that Johnson's usurpation occurred in December of 1915, at which time Calder was no longer the legal owner of the property.

Calder did, however, almost immediately after execution of the Dexter deed and the redemption of the property from the tax adjudicatee, J. W. Jones, begin to treat the property as an instrument of barter and security in the financing of his operations. He first mortgaged it in July of 1912, through his agent, George M. Calder, to secure a note for $800 given Austin & Walne of Vicksburg, Mississippi. On April 2, 1913, George and George M. Calder, being indebted to the Central Savings Bank and Trust Company of Monroe, Louisiana, in the amount of $788.50, executed their joint note for this amount, payable on November 15, 1913. As security for this note they gave four mortgage notes, one, in the amount of $1,000 and executed by George Calder to his own order on March 29, 1913, was secured by the Dexter property. The record does not show who paid the 1912 taxes on the property, the property for that year still being assessed in the name of "Mariah Dexter Est."; but the record does show that Calder permitted the property to be sold for the taxes of 1913 (for which year the tract was assessed in his name) to W. C. Chennault on June 6, 1914,

and that the bank, not Calder, redeemed the property from Chennault in November of 1914. The bank also paid the taxes on the property for 1914 and 1915, the only other two years Calder appears on the assessment rolls as the owner thereof. On April 30, 1915, the bank secured a judgment against George M. Calder (its rights against George Calder, a non-resident, being specifically reserved) on the $788.50 note and on June 25 thereafter petitioned for the seizure and sale of the Dexter property in satisfaction thereof. The bank bid the property in at the subsequent sale for $800, becoming the legal owner of the property on August 11, 1915, under sheriff's deed duly executed. It is undisputed that the bank made no effort whatsoever to take actual physical possession of the property, but it is readily apparent that when Wisdom Johnson dispossessed the wife and children of Walter Dexter in the latter part of 1915 as the purported tenant of "Calder" the legal title to the property was no longer in George Calder, but in the bank.

Up until this time the Central Savings Bank & Trust Company had no knowledge that Walter Dexter was the owner of only an undivided half interest in the property he purportedly sold in its entirety (along with Willie and Louis) to George Calder. However, approximately a year later, preparatory to selling the property for the purpose of wiping the Calder account off its books, the bank caused an abstract of the title to be made by J. W. Summerlin.

From that time the bank had knowledge of the defective title and when the property was sold by it to Daniel T. Phillips on November 28, 1917, for $1,800, Phillips was so advised and the warranty of the bank was limited in the deed to the $1,300 "investment" it then had in the property.

Phillips moved onto the property and worked it for a year. At just about this same time, or in the early part of 1918— a year before Anding, who lived next door to the Buchanans in Delhi, acquired the property from Phillips—Effie Dexter, still living on the Buchanan property in Delhi with her foster mother, Amanda White, was married in the Buchanan home by Judge Buchanan to Albert Decatur. Immediately thereafter she went back to the settlement in which the Dexter property lies with her husband and lived there with him for approximately a year in the home of Laura Shaffer, the mother of Tom Shaffer, whom Amanda White had married many years previous. In 1919 Effie moved to Monroe, Louisiana, where she was still residing when this suit was instituted, although in the meanwhile she had divorced Albert Decatur and married Scofield Arnold, her present husband. During these many years she only returned to the Delhi community on one or two occasions for a few days.

On January 4, 1919, James L. Anding, Sr., who had continued to operate his general merchandise store in Delhi during all of these years (engaging in real estate

operations on the side), and had lived next to the Buchanans where Effie moved with Amanda White in 1909, purchased the property in controversy from Phillips for $2,000. Although Phillips warranted full title to this property, Anding secured and recorded along with his deed an affidavit of Harrison Bennett, the nephew of Mariah Dexter who had lived just behind the Dexter place and knew the family well, wherein he stated that on May 31, 1912, the date on which Walter, Willie, and Louis Dexter executed the deed purportedly transferring the property in its entirety to George Calder, these three were the only living heirs of Mariah Dexter. (Anding also had in his possession at the time of the purchase the abstract of title prepared in 1916 by J. W. Summerlin for the Central Savings Bank & Trust Company. It was given to the Federal Land Bank in 1936 when Mrs. Anding sought a loan and was produced in court by the Andings, after this suit was instituted, under orders of subpoena duces tecum secured by the plaintiffs.) From that time the property was farmed out to various tenants who operated it for Anding on a more or less sharecrop basis.

On April 28, 1928, James L. Anding, Sr., then mortally sick with cancer, permitted the Dexter tract to be seized by the sheriff for non-payment of the taxes, although it is conclusively shown that he had, at the time, ample means with which to pay them and that he had, in fact, paid the taxes due

by him on all of his other real estate holdings. At the tax sale in June following, the property was purportedly purchased by his son, James L. Anding, Jr., who was then and during the remainder of his life a resident of Missouri. It is highly significant that in every place in the tax deed itself, as well as in the recorded copy thereof typed separately in the conveyance records of Richland Parish, the name originally appearing in these instruments as the purchaser has been erased and the name of James L. Anding, Jr., has been typed in over these erasures.

On August 25 of 1928 James L. Anding, Sr., made his last will. He died on December 31 following, leaving as forced heirs his five children, three of whom were then minors—Corre who was 18, George who was 17, and Elizabeth who was 13—and his succession was opened immediately thereafter on January 3, 1929. Mrs. Anding qualified as the executrix of the estate and on January 19, 1929, caused the homologation and approval of an inventory that had been taken of the assets of the estate. (The inventory did not include Anding's current bank accounts, one of which showed a balance of $1,505.16 on the day he died, though this account was from that time checked against, nor all of the realty owned by him, including the property just months before permitted to go at tax sale and in which the estate had an undoubted interest since the period in which it could be redeemed had not elapsed.) This was

the last step taken in settling the succession, and it was still·open when the instant suit was filed. The inventory, despite the omissions above noted, showed that James L. Anding, Sr., left an estate valued at $27,344.27. In addition, Mrs. Anding received the $15,000 proceeds of the insurance policy on her husband's life. Yet no effort was ever made by her, as the executrix of the estate, to redeem the property thus lost to the succession through the tax sale manipulation, although she did continue from that time until 1932 (when the property was transferred to her by her son, James L. Anding, Jr., the tax purchaser, for the purported consideration of $4,000, with full warranty of title) to administer the property as had her husband, farming it out to various tenants and taking crop liens to insure money advanced to them.

Interest centered around Delhi in 1943 because of the potential mineral value of the property in the area and, on August 25, 1944, Charles H. Murphy, Jr., one of the defendants in this case, secured a mineral lease from Mrs. Elizabeth K. Anding covering the Dexter tract for a term of 5 years, for $320 in cash plus royalties and other considerations. Mrs. Anding appeared as the lessor in this instrument as "E. K. Anding, widow of J. L. Anding, deceased." Murphy assigned this lease, along with the 95 others he had secured in this field during a period beginning August 17, 1944, and ending on December 11, 1944, to

the Sun Oil Company on January 9, 1945, "without warranty of any kind." The assignment was recorded on February 21 thereafter. . In the latter part of 1944, though not on the Dexter property, Murphy drilled the discovery well in this field. By deed dated December 11, 1944, Mrs. Anding partitioned with her children the mineral interest in the property owned by them, including that under the Dexter tract, but this act was superseded by another one dated September 20, 1945, wherein it is stated that all of the mineral rights therein partitioned, including those under the Dexter property, belonged to the "community estate," some having been acquired prior to the death of James L. Anding, Sr., and some having been acquired subsequent to his death with community funds and property.

Sun Oil began the drilling of a well on the Dexter tract proper on September 27, 1945.

Robert B. Prentice, one of the plaintiffs, obtained a mineral lease and royalty deed affecting the property from Effie Dexter Arnold on August 25, 1945, for $5,100. Learning for the first time on October 2, 1945, of the company's intention to drill a well thereon, he notified Murphy and Sun Oil by registered letter dated October 3, 1945, of his claim to an interest in the property. The company, in a reply letter of October 8, refused to recognize his claims, stating as its opinion, from a study of the complete abstract of title the com-

pany had had made, *as well as an investigation of the occupancy and possession of the land,* that any irregularity in the earlier chain of title had been cured by prescription and, therefore, the lease held by it was a valid one. The well was completed on October 22 and this suit was instituted on October 30, 1945, by Effie Dexter Arnold, Prentice, and Murray Hudson, holder of another royalty deed from Effie.

The pleadings in the case are numerous. Filling almost the entire first volume of the record (composed of eight volumes in all), many of these pleadings relate to the taking of oral testimony and the production of instruments.

The allegations of the petition are to the effect that Effie Dexter Arnold, the owner of an undivided half interest in this property since the death of her father in 1909, of which interest she has never divested herself, is entitled to be recognized as such, subject to the valid conveyances of mineral interests therein executed by her in favor of Robert B. Prentice and Murray Hudson on August 25, 1945; that the tax sale from J. L. Anding to James L. Anding, Jr., in 1928 (about which plaintiff Arnold had no knowledge until four months prior to the institution of this suit), as well as the transfer of this same property to Mrs. Elizabeth K. Anding in 1932, are simulations, pure and simple, having been entered into intentionally by all of the parties involved for the purpose of defrauding her and thus depriving her of her property; and that all

of the defendants, the Andings as well as their lessees Murphy and Sun Oil, have each and every one of them acted in bad faith and possess the property as such. They seek the cancellation from the records of the tax sale to James L. Anding, Jr., and his transfer to his mother, of the Murphy lease and its assignment to the Sun Oil Company, and of the instruments of December 11, 1944 and September 20, 1945, wherein the Andings sought to partition among themselves the minerals under this land. They further ask that their right to sue for an accounting of the oil produced from the property and for damages from all of the defendants be reserved. In supplemental petitions they made parties defendant the legal heirs of Mrs. Elizabeth K. Anding and James L. Anding, Jr., both of whom died after this suit was instituted.

Denying in a general way all of the allegations contained in the petition, and particularly that Effie Dexter Arnold is the legal heir and child of John Henry Dexter, or the legal heir of his parents, Mariah and Boston Dexter, the defendants, in separate answers, trace their title back to the deed under which Mariah Dexter purchased the property from Hiram R. Lott in 1875. Then, averring they and their authors in title have had possession of these lands in good faith, under conveyances translative of property, continuously, openly, and peaceably and adversely to all others for more than 30 years (without stipulating the acts of possession in any specific au-

thor in title), they plead specially: (1) the prescription of 30 years controlling the renunciation and acceptance of successions, under Articles 1030, 1305, and 3548 of the Revised Civil Code; (2) the prescription of 10 and 30 years acquirendi causa under Articles 3478–3503 and 3515; (3) the prescription of 2 and 5 years applicable to informalities in sales by sheriffs under court orders, provided for in Article 3543; (4) the prescription of 20 years against the attack on the deed to Calder on May 31, 1912 (apparently on the contention that an agent's authority is presumed after this period); and (5) the prescription or preemption of 3 and 5 years against the tax sale to James L. Anding, Jr., under the provisions of Section 11 of Article X of the Constitution of 1921. In addition, as to Effie Dexter Arnold, there is a special plea that she is estopped to deny the validity of the tax sale by reason of her laches and long silence. Murphy and Sun Oil interpose the defense that their rights cannot be disturbed by the claims of the plaintiffs since they acquired their interest in good faith, *"upon the strength of the public records,"* without any knowledge of any defects in the title. They also ask, as an alternative plea, that they be reimbursed for the amounts expended by them in developing and operating the property in the event the plaintiffs are successful in prosecuting their claims, the sum of $30,000 allegedly having been expended in this manner prior to the filing of this suit.

The trial judge (who was especially appointed to hear this case upon the recusation of the regular judge) rendered judgment on June 30, 1947, almost two years after the suit was originally filed, in favor of the plaintiffs as prayed for, decreeing Effie Dexter Arnold to be the lawful owner of an undivided half interest in the land, subject to the lease and fractional royalty interests conveyed by her to Robert B. Prentice and Murray Hudson, ordering cancelled from the public records the tax sale from James L. Anding, Sr., to James L. Anding, Jr., dated June 4, 1928, and reserving to the plaintiffs their right to sue for an accounting of the minerals produced from the property subject to their accounting for their proportionate part of the taxes due. This judgment is sustained by the written opinion of the trial judge ad hoc wherein he states no effort was made by George Calder to determine whether Walter, Louis, and Willie Dexter were the owners of the property; that the defect in the title to the property "was known to all parties dealing with the property" at the time Anding acquired it from Phillips in 1919; that the tax sale to James L. Anding, Jr., was entered into for the purpose of procuring a clear title to the land and, as such, an absolute nullity that could not form the basis of prescription; and that *"the evidence is clear that defendants C. H. Murphy, Jr., and Sun Oil Co. knew, or could with reasonable diligence have known, of the defect in the Anding title, prior to their drilling of the*

*well on the property*," and "In addition, the testimony shows that in February or March, 1945, some six months before the well was drilled, an affidavit was procured and in the possession of defendants showing the heirship of Effie D. Arnold." (Italics ours.)

 Our very careful reconsideration of the entire record and of all of the issues raised in this case has not caused us to alter our previous conclusion that James L. Anding, Sr., purchased this property from Phillips in 1919 in bad faith and with full knowledge of the outstanding interest therein of a minor heir, and that the tax sale and the subsequent transfer of the property to the widow of Anding was, from beginning to end, a simulation entered into for the purpose of perfecting a defective title—all as was so ably demonstrated by the Justice ad hoc in the original opinion. We also adhere to his conclusion that "as the record stands today, the preponderance of the evidence would indicate that this possession (the possession of Wisdom Johnson for Calder) took place after the Central Savings Bank & Trust Company had acquired title by sheriff's deed," and, accordingly, the pleas of prescription and preemption of 3, 5, 10, and 30 years must all be overruled. But we do not feel the case should be remanded to the lower court for the introduction of further evidence by the defendants touching on the possession of Calder and the nature of Walter Dexter's occupancy of this property after

his purported sale thereof to Calder in 1912.

All things must, in time, come to an end. This is particularly true of litigation. The case has been in the courts for almost five years, two of which were consumed in its trial. The defendants had ample opportunity to obtain and produce any and all testimony whatever that they felt was necessary to the proof of their claims. At one stage of the trial they even secured the continuance of the case for a period of five and a half months because of the pregnancy of one of the witnesses they thought important. The issue of the possession of *all* of the authors in title of the defendants was clearly presented in the lower court and, as early as October 8, 1945, before this suit was instituted, an exhaustive exploration had been made into the title and the occupancy and possession of the land, as evidenced by the following statement made in the letter the legal department of Sun Oil Company addressed to the attorneys of Robert B. Prentice: "We have secured a complete abstract of title to this land and have had this examined by our attorneys in Louisiana. We have also had an investigation made as to the occupancy and possession of the land." That there may be no doubt as to the appreciation of the defendants of the importance of this vital issue, and, indeed, that their entire case under their prescriptive pleas rested on this pure question of fact, we quote the following statement made

during the course of the trial by one of the attorneys representing the defendants: "* * * *in order that there may be no misunderstanding as to the position of my clients, C. H. Murphy, Jr., and Sun Oil Company, I will state for the record, in defense of this case they stand on the record of their lessor and her possession, and that of her predecessors in title * * *." (Italics ours.)

Despite this, and although the defendants had the burden of proving the possession of all who purportedly held title from the time the property was severed from the estates of Boston and Mariah Dexter under the allegations contained in their answers, in order that Effie Dexter might be divested of her legal half interest in this property, they did not bring to the witness stand one single witness—not even Robert Nathan, from whom they secured the affidavit of the heirship of Mariah and Boston Dexter on March 21, 1945, and who purportedly knew all of these people and their history, or Willie and Louis Dexter, both of whom purported to convey an interest in this property to Calder in 1912 and who were then living in Tallulah, Louisiana, according to the Nathan affidavit—to testify with respect to the possession of any one other than the Andings. The only inference we can draw from their action is that in their very exhaustive investigations they either found that the persons interviewed could not assist in the proof of their case or that such persons would, if called to testify, give testimony adverse to their cause. Bates v. Blitz, 205 La. 536, 17 So.2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210; Fried v. Bradley, La.Sup., 52 So.2d 247.

We feel, therefore, that the following quotation from the case of Esmele v. Violet Trapping Company, 184 La. 491, 166 So. 477, 481, is particularly apropos: "To send the case back to the lower court for further evidence under such circumstances would clearly lead to abuse, in that litigants would submit their cases upon what they believed to be the weakness of their opponent's evidence, knowing that, if they failed, they would be given another opportunity to introduce evidence to rebut it." See, also, Lowry v. Erwin, 5 La.Ann. 205; Yarbrough v. Swift & Co., 119 La. 344, 44 So. 121; Jones v. Curran, 156 La. 1055, 101 So. 415; Madison v. Prudential Insurance Co., 190 La. 103, 181 So. 871; M. H. Nahigian, Inc., v. Haddad, 205 La. 1009, 18 So.2d 598.

This leaves for our consideration the contention of the defendants Charles H. Murphy, Jr., and Sun Oil Company that we erred in holding the law of registry, applying only to third parties purchasing immovables or real rights in immovables, does not protect mineral lessees, who can acquire no greater right than their lessor.

The learned Justice ad hoc, relying on the well established jurisprudence of this court, very aptly pointed out that the provisions of the Revised Civil Code with

respect to the law of registry, Articles 2251–2266, have no application in this case for the reason "that the usual oil and gas lease with a cash or royalty consideration, or both, such as the one presently before us, is a contract of letting and hiring within the meaning of the codal articles, and that the lessee in such a mineral lease obtains an obligatory or personal right only, and not a servitude on the realty or a real right in the land." See, Article 48 of the Code of Practice; Articles 2696, 2703, 2704 of the Revised Civil Code; Hoffman v. Laurans, 18 La. 70; Young v. Chamberlin, 14 La.Ann. 687; Fox v. McKee, 31 La.Ann. 67; Rojas & Conner v. Seeger, 122 La. 218, 47 So. 532; Leightsey v. Welch, 158 La. 1024, 105 So. 51; Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 82 A.L.R. 1264; Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846; and Tyson v. Spearman, 190 La. 871, 183 So. 201.

The provisions of the Revised Civil Code treating of the subject of lease, to be found under Chapters 1 and 2 of Title IX, define a lease to be a synallagmatic contract by which one party gives to the other, for a price, the use and enjoyment of a thing (Article 2669), the one granting the lease being called the lessor or owner and the one to whom the lease is made being called the lessee or tenant (Article 2677). The price given must be certain and determinate (Article 2671) but a lease may be written or verbal (Article 2683), consent alone being sufficient (Article 2669). The duration and the conditions of the lease are regulated by the contract or by mutual consent (Article 2684).

The obligations and rights of the one letting out "things," as set out in Section 2 of Chapter 2, are that the lessor, in addition to delivering the thing leased to the lessee and maintaining it in such a condition that it will serve for the use for which it was hired, must "cause the lessee to be in a peaceable possession of the thing during the continuance of the lease." Article 2692. He also warrants the enjoyment of the thing leased against the claim of the *owner* (Article 2682), but is not bound to guarantee the lessee against disturbances caused by persons *"not claiming any right to the premises,"* in which case the lessee may recover damages against the person occasioning such disturbances (Article 2703). However, "If the persons by whom those acts of disturbance have been committed, pretend to have a right to the thing leased, or if the lessee is cited to appear before a court of justice to answer to the complaint of the person thus claiming the whole or a part of the thing leased * * * *he shall call the lessor in warranty,* and shall be dismissed from the suit if he wishes it, by naming the person under whose rights he possesses." Article 2704. If the lessee is evicted, then the lessor is answerable in damages for the loss sustained by the interruption of the lease.

Article 2696. See, also, Code of Practice, Articles 43, etc. (Italics ours.)

In Articles 2710–2726, setting out the *rights* and *obligations* of the lessee, we find he is compelled to use the property in the manner intended as a good administrator, upon the penalty of the dissolution of the lease and damages for losses incurred by the owner; that he pay the rent in accordance with the terms of the lease, under penalty of being ejected from the property; that he must maintain the property in repair, as specified; that he may remove the improvements and additions he has made to the thing leased under certain conditions; and that he must prevent any encroachments and give notice thereof to the proprietor under penalty of being liable in damages to the lessor. His right to sublease is also subject to restriction.

It would appear from these pronouncements that the lawmakers intended to limit the rights and remedies of a lessee in the case of an eviction by one lawfully the owner thereof to a recovery in damages against the lessor. This is clearly borne out by the fact that in case there is an encroachment upon the leased property the lessee must not only notify his lessor of such encroachment (Article 2724) but *must* also call his lessor in warranty in the event he is cited to appear in court to answer the complaint of one claiming an interest in or the whole of the property under lease to him (Article 2704). Under these articles, therefore, the ordinary lessee cannot bring a suit himself or stand in judgment where one is instituted against him. Articles 43 and 48 of the Code of Practice.

The intention of the lawmakers with respect to the rights and obligations of the lessee is given further emphasis and clarity in the articles of the Code of Practice dealing with procedure in real actions, Article 48 of this group being quoted herewith in full:

"Those who possess in the name of another, such as tenants, are not entitled to the possessory action, when disturbed in the enjoyment of the real estate which they possess in that quality, or even when they are expelled; but *they have their remedy against the person in whose name they possess,* and they are bound to apprise him of the disturbance they have experienced, by personal notice, if he be within the State, and by advertisements in the newspapers, if he be out of the State, in order that he may quiet them if it can be done; otherwise they lose all right to claim damages from him, and will be liable to him besides for all the loss and damages which he may have sustained through their neglect." (Italics ours.)

It is true that upon the adoption of Act No. 205 of 1938 mineral leases and similar contracts were classified as "real rights" and "incorporeal immovable property," but this classification extends no further than a grant to mineral lessees of the right to avail themselves of any procedural remedy that may be available to the owner

of the realty in the protection and defense of such rights as the lessor legally conveyed to them. As this court in the original opinion stated this proposition, the jurisprudence since the adoption of Act No. 205 of 1938 has been that the act is "remedial and procedural in character, and that it has not affected or changed any of the substantive rights flowing from the execution of mineral leases." See, Allison v. Maroun, 193 La. 286, 190 So. 408; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336; Amerada Petroleum Corp. v. Reese, 195 La. 359, 196 So. 558; Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473.

It therefore follows that the provisions of Act No. 205 of 1938 do not confer upon Murphy and Sun Oil Company such a substantive right in the realty that they may, by reliance upon the public records, acquire a greater right than an ordinary lessee could acquire and a greater right, in fact, than their lessor possessed.

But granting these mineral lessees all of the rights accorded those acquiring immovable property rights on the faith of the public records, we think the record in this case unmistakably shows Murphy and Sun Oil were in legal bad faith.

Murphy secured this lease from Mrs. Anding on a "take-off" title, with the view of doing such curative work as a later examination of the public records might disclose, and he subsequently transferred his half interest therein to Sun Oil Company *"without warranty of any kind."* The lease contract, dated August 25, 1944, reflects that Mrs. Anding executed the same as the "widow of J. L. Anding, deceased." Further examination of the record shows the succession of J. L. Anding, though opened many years previous, had never been closed; that among the forced heirs of J. L. Anding was one James L. Anding, Jr., in whose name the property had been adjudicated for the unpaid taxes of 1927 under an assessment to J. L. Anding, his father, and just a few months prior to his father's death in 1928; that although James L. Anding, Jr.'s, mother, to whom he transferred the property, was the qualified executrix of the succession under a will of the deceased written after the 1928 tax sale and a short time before Anding's death, she not only did not redeem the property but did not cause the same to be listed as one of the assets of the community. An examination of the tax rolls, which is vital where one is relying on the faith of the public records, and particularly so where a title derived from a tax sale must be considered, readily discloses the tax debtor, J. L. Anding, assessed with considerable property for the year 1927, paid, in March of 1928, all of the taxes due on this other property, permitting the property in question to be seized in April, the very next month, for the non-payment of these taxes, and, in June to be sold therefor. The record further reveals that the name of the adjudicatee in the original tax deed, and in the recordation thereof in the conveyance office,

was erased after the recordation of the deed and the name of James L. Anding, Jr., superimposed over these erasures wherever they appear in the instrument.

These facts, plainly revealed by the public records, were sufficient in the unanimous opinion of the experts who testified, all of whom were eminent attorneys of this state and abstracters of note with extensive experience in the title field, to have placed an examiner of the title on notice that these manipulations mirrored a picture of simulation that had been executed for the ostensible purpose of perfecting the title by cutting off an outstanding interest, and that interest was readily disclosed by an examination of the conveyance records of Richland Parish.

The attorneys who examined the title for Sun Oil Company and Murphy were obviously of the same opinion, for we find that Murphy and Sun Oil, in their effort to divest Effie Dexter of her interest in the property, did not rely on the tax sale of 1928, but, instead, on the prescriptions of 10 and 30 years.

This is evidenced by the final opinion of the attorney examining the abstract for these defendants, rendered on March 26, 1945—at which time they had in their possession an affidavit secured by one of their agents on March 21, 1945, from Robert Nathan clearly showing the outstanding interest of Effie Dexter—that in his opinion his objection to the title mentioned in his preliminary opinion "is taken care of by the prescription of ten and thirty years, under the provisions of Articles 3478 and 3499, in view of the fact that there has been submitted to me in connection with this objection an affidavit showing possession in the present owner and her authors in title for a period of more than thirty years."

However, if there could be any doubt as to the correctness of this conclusion, we think the action of these defendants after they learned of the outstanding interest of Effie Dexter—7 months before this suit was instituted and 5 months before Prentice and Hudson acquired their interests from Effie Dexter—obviates it. Sun Oil and Murphy not only made no effort whatsoever to secure the interest of Effie Dexter or a lease from her, but persisted in their opinion that their lease from Mrs. Anding was valid under the prescriptive laws of the state, for when Prentice advised them of these claims Sun Oil, in a letter dated October 8, 1945, before this suit was instituted, stated: *"Our attorneys have advised us that in their opinion any irregularity which may appear in the early chain of title has been cured by prescription."* (Italics ours.)

When our lawmakers established the present public policy of this state with reference to the law of registry, they did so for the purpose of protecting innocent third parties dealing with immovable property and to render safe investments in real property. It was never their intention that the law of registry be used as a means of defrauding rightful owners of their property

through the recordation of fraudulent and simulated sales that clearly appeared as such on the face of the records. Third parties claiming under such instruments or muniments of title cannot ignore the facts revealed by these public records that unquestionably disclose the perpetration of a palpable fraud.

For the reasons assigned the judgment appealed from is affirmed

HAMITER, J., dissents, adhering to written reasons heretofore assigned by him.

HAWTHORNE, J., dissents and assigns written reasons.

McCALEB, J., dissents in part with written reasons.

HAWTHORNE, Justice (dissenting).

The Court has now come around to the view which I expressed in my dissent to the original opinion that justice would not be served by remanding the case, and the court proceeds to decide the case on the evidence now before it.

I adhere to the views expressed in my dissent to the original opinion, but, even if I agreed completely with the opinion on rehearing as to its finding of fact in regard to the time of Wisdom Johnson's possession, I nevertheless could not conclude that judgment should be rendered for the plaintiffs. As I understand the majority opinion, it turns upon the one fact that Wisdom Johnson did not go on the property until after Calder had been divested of title, and from this the court concluded that Calder never had the necessary possession to start the running of the acquisitive prescription.

The record conclusively establishes that Walter Dexter and his family remained on the property after his sale to Calder and did not remove therefrom until they were forcefully evicted by Wisdom Johnson in the name of Calder. Under the law of this state the unexplained continued possession of a vendor is presumed to be for the benefit of the vendee, so that the possession of Walter Dexter after his sale to Calder was presumed to be for the benefit of Calder. There is no evidence in this record to show that Walter Dexter's possession was hostile to Calder, or to show that his conduct was such that Calder would know that a new order of things had begun.

For the reasons stated in my dissent to the original opinion and for this reason also, therefore, I am of the opinion that Calder had the necessary possession and that judgment should be rendered for the defendants sustaining the plea of prescription of 10 years acquirendi causa.

McCALEB, Justice (dissenting in part).

The only reason why I voted for a rehearing in this case was because I enter-

tained some doubt as to the correctness of our holding that a mineral lessee, not being a third purchaser, acquired no greater right than his lessor and was therefore not entitled to rely on the faith of the public records. After a reconsideration of this matter, all my doubts have been dispelled and I am satisfied that the ruling is correct. The validity of the reasons for the ruling are convincingly demonstrated by the majority opinion on rehearing.

However, I cannot agree with the conclusion reached on this rehearing affirming the judgment of the district court as I still harbor the view that the case should be remanded for the purpose of hearing testimony relative to the date upon which Wisdom Johnson took possession of the land as a tenant of George Calder. The holding that the case should not be remanded is based on the ground that, since defendants bore the burden of proving possession in George Calder in order to establish title under their plea of the 10-year acquisitive prescription, their claim must fail as possession has not been shown.

But I am not so sure that possession by Calder has not been proved. That Wisdom Johnson obtained possession of the property as a tenant of Calder, either in the year 1914 or 1915, is not seriously questioned. This is shown by the uncontradicted testimony of a number of witnesses and was regarded as an established fact in the original majority opinion and the separate opinions of the two dissent-

ing justices. The only matter about which any doubt was expressed concerned the date of Wisdom Johnson's possession. Clearly, if his possession as tenant of Calder was during the time that Calder owned the property, the plea of prescription is good and defendants should win their case. On the other hand, if Wisdom Johnson's possession for Calder was subsequent to the time the Central Savings Bank & Trust Company acquired the property at foreclosure sale, and without the bank's consent, then the plea of prescription would not be well founded according to the view set forth in the original opinion.

For my part, I believe that the interest of justice requires a remand of the case for the purpose of hearing evidence, if any can be obtained, on this important question. And it will not do to say that the possession of Calder, through Wisdom Johnson, has not been established merely because the date of that possession is somewhat obscure—for, as pointed out in the original opinion, "it is obvious that neither the plaintiffs nor the defendants explored this question fully in the trial below * * *". Indeed, plaintiffs practically conceded possession in Calder when the case was originally argued and briefed in this court, basing their entire contention on the fact that the bad faith possession of Anding could not be tacked on to the good faith possession of Calder.

In addition, a remand of the case would appear to be most appropriate when con-

sideration is given to the fact that the justices, who have made a careful study of the record, have reached diverse conclusions in their appreciation of the evidence touching upon Calder's possession. Thus, the Chief Justice, in the opinion on rehearing, is very positive that no possession in Calder has been established but Justice Hawthorne, in his original dissent, was convinced that not only does the record establish possession of Calder through Johnson but that Johnson's possession occurred during the time when Calder was the record owner of the property. And justice ad hoc Viosca, the author of the original opinion, finds possession by Johnson, as tenant of Calder, but concludes that the date of that possession is indefinite.

I believe that the original opinion should be reinstated.