DREW, J.
 

 |,In this dispute over the ownership of an 80-acre tract of land located in Bien-ville Parish, John L. Cockerham, Jr. (“Junior”) and Melissa Cockerham (“Melissa”) appeal a judgment recognizing the ownership interests of others, including the petitioner, Clarence Cockerham (“Clarence”).
 

 We affirm.
 

 FACTS
 

 The property at issue is a tract measuring approximately 80 acres and is described as follows:
 

 The South Half of the Southwest Quarter (S/2 of SW/4), Section 13, Township 15 North, Range 8 West, Bienville Parish, Louisiana.
 

 The property was at one time owned by Mose Henry Cockerham (“Mose”), who attempted to perfect a homestead certificate on the property in 1946. Mose died intestate in 1949. It is not entirely clear as to where Mose fits in the Cockerham family’s genealogy. In a 1953 petition filed by Junior’s father in Mose’s succession, it was asserted that Mose was the son of Jim Mose Cockerham and Hannah Reaves Cockerham. An affidavit filed in the succession states the same. Thus, Mose was the half-brother of Junior’s father. However, Clarence testified at trial that Jim Mose Cockerham and Mose were actually the same person. We note that in Clarence’s petition, when referring to Mose’s succession, he states that Mose was Jim Mose Cockerham’s son. It makes no difference as it relates to the issues in this appeal whether Mose is treated as the son of Jim Mose Cockerham or as the same person, so we will accept the recollections made 12in 1953 over the recollection made at trial of someone who was not even alive when Mose died.
 

 Jim Mose Cockerham was married first to Hannah Reaves Cockerham, and born of the marriage were four children: Mose, Currie Mae Cockerham Jack (“Currie Mae”), Currie D. Cockerham Mingo (“Cur-rie D.”), and Gene Cockerham. Gene Cockerham (“Gene”) is Clarence’s father. Jim Mose Cockerham’s second marriage was to Drucilla Boston Cockerham, and one child, John L. Cockerham (“John”), was born of the marriage. Junior is one of John’s twelve children. Jim Mose Cocker-ham died in 1924.
 

 In the judgment of possession filed in Mose’s succession in 1953, Gene, Currie Mae, and Currie D. were each recognized as the owner of a 7/24 interest in the property, and John was recognized as the owner of a 1/8 interest in the property. A patent on the land was issued to the heirs of Mose Henry Cockerham in 1954 and recorded in 2004.
 

 Currie D. died in 1973. In a judgment of possession rendered in her succession in 2007, her 7/24 interest in the property and in funds deposited in the court registry relating to an expropriation lawsuit
 
 [1]
 
 were distributed to her heirs.
 

 Currie Mae died intestate and without any children in 1983. In a judgment of possession rendered in her succession in
 
 *1267
 
 2008, Clarence was ^recognized as the owner of a 3/48 interest in her property; Junior and Melissa each received a 1/48 interest in her property.
 

 John died in 1995. No judgment of possession in his succession was filed into evidence.
 

 Gene had one other child in addition to Clarence. This child died in 1977, leaving-three descendants. Gene died intestate in 2000. In the judgment of possession rendered in Gene’s succession in 2007, Clarence was recognized as the owner of an undivided 1/2 interest in an undivided 7/24 interest in the property and in the funds deposited in the court registry relating to the expropriation lawsuit.
 

 In October of 2003, Clarence filed a petition for declaratory judgment and/or petitory action against Junior and his wife, Melissa. Clarence noted an attempted donation of the entirety of the tract from John and his wife, Clara, to Junior and Melissa on October 30, 1993. Clarence was concerned that defendants might try to claim ownership of the property through 10-year acquisitive prescription, so he averred that this suit would interrupt prescription under La. C.C. art. 3462. Clarence prayed that the court render a judgment declaring his ownership interest in the property and that no acquisitive prescription had accrued to the benefit of Junior and Melissa.
 

 Answering the suit, Junior and Melissa contended that Mose did not own or have an interest in the property. They asserted that their ancestors in title, John and his wife, had acquired the property by cash sale deed, and that they had acquired ownership of the property by both 10-year and 30-year acquisitive prescription.
 

 |4Neither Junior nor Melissa testified at trial. Junior was unavailable because he was inmate in a Texas prison. Melissa chose not to attend the trial.
 
 [2]
 
 The trial court found in favor of Clarence and recognized the ownership of the property as follows:
 

 • A 3/24 interest was owned by Junior and Melissa from John.
 

 • A 7/24 interest was owned by the heirs of Gene (Clarence owned one-half of this 7/24).
 

 • A 7/24 interest was owned by the heirs of Currie D.
 

 • A 7/24 interest was owned by the heirs of Currie Mae (Clarence owned 3/48 of this 7/24, and John and Melissa each owned 1/48 of this 7/24).
 

 All funds on hand and all funds held in the court registry from an expropriation lawsuit involving a pipeline on the property were ordered distributed to the co-owners.
 

 Junior and Melissa have appealed.
 

 DISCUSSION
 

 Junior and Melissa argue on appeal that the trial court erred in finding that they had not acquired the property through acquisitive prescription of either 10 years or 30 years.
 

 Acquisitive Prescription of 10 years
 

 Ownership and other real rights in im-movables may be acquired by the prescription of 10 years. La. C.C. art. 3473. The requisites for the acquisitive prescription of 10 years are possession of 10 years, good faith, | ¿just title, and a thing susceptible of acquisition by prescription. La. C.C. art. 3475.
 

 
 *1268
 
 The purpose of good faith acquisitive prescription is to secure the title of a person who purchases immovable property by a deed translative of title, under the reasonable and objective belief that he is acquiring a valid title to the property, and thereafter remains in peaceful possession of the property for more than 10 years without any disturbance by the true owner.
 
 Phillips v. Parker,
 
 483 So.2d 972 (La.1986);
 
 Heirs of Morris v. Simpson,
 
 43,693 (La.App. 2d Cir.10/29/08), 997 So.2d 659.
 

 For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is owner of the thing he possesses. La. C.C. art. 3480. The trier of fact must ascertain in the light of objective considerations whether a reasonable person in the position of the possessor could believe himself to be the owner. Comment (c) to art. 3480. Although good faith is presumed, this presumption is rebutted on proof that the possessor knows, or should know, that he is not owner of the thing he possesses.
 
 See
 
 La. C.C. art. 3481.
 

 A just title is a juridical act that is sufficient to transfer ownership or another real right. La. C.C. art. 3483. The act must be written, valid in form, and filed for registry in the conveyance records of the parish in which the immovable is situated.
 
 Id.
 

 In a 1963 cash deed, Rufus Lacy purported to convey the property to John. The evidence at trial did not reflect how Rufus Lacy may have acquired the interests of all co-owners. We cannot find that Lacy had |(ianything to convey. Having received a 3/24 interest in the property in 1953, John should have known that Lacy did not own the property which he was attempting to convey to him in 1963. Accordingly, John was in bad faith, and acquisitive prescription of 10 years is not available to him.
 

 Acquisitive Prescription of BO Years
 

 Ownership and other real rights in im-movables may be acquired by the prescription of 30 years without the need of just title or possession in good faith. La. C.C. art. 3486. The possession must be continuous, uninterrupted, peaceable, public, and unequivocal. La. C.C. art. 3476.
 

 The general and well-established jurisprudential rule is that an owner in indivisión cannot acquire by prescription the rights of his co-owners in the property held in common. Possession by one co-owner is generally considered as being exercised on behalf of all co-owners.
 
 Arnold v. Sun Oil Co.,
 
 218 La. 50, 48 So.2d 369 (1949);
 
 Hill v. Dees,
 
 188 La. 708, 178 So. 250 (1937);
 
 Dew v. Hammett,
 
 150 La. 1094, 91 So. 523 (1922);
 
 Simon v. Richard,
 
 42 La. Ann. 842, 8 So. 629 (1890);
 
 Headrick v. Lee,
 
 471 So.2d 904 (La.App. 2d Cir.1985).
 

 It is equally well settled that an exception to the general rule is recognized in those instances where the possessing co-owner gives notice to the other co-owners that he intends to possess as owner adversely and contrary to the common interest. Under such circumstances, one owner in common may prescribe against a co-owner provided such possession be clearly hostile and notice be given thereof.
 
 Franks Petroleum,, Inc. v. Babineaux,
 
 446 So.2d 862 (La.App. 2d Cir.1984);
 
 Givens v. Givens,
 
 273 So.2d 863 (La.App. 2d Cir.1973). Actual notice to other co-owners of the possessing co-owner’s intent to possess for himself is not necessary.
 
 Franks Petroleum, Inc., supra.
 

 In determining whether a particular case falls within the exception rather than the general rule, this court has held that mere occupancy, use, payment of tax
 
 *1269
 
 es and similar acts of possession will not suffice to constitute notice of adverse possession to an owner in common.
 
 Givens v. Givens, supra.
 

 This exception to the general rule is reflected in La. C.C. arts. 3439 and 3478. Article 3439 provides that a co-owner, or his universal successor, commences to possess for himself when he demonstrates this intent by overt and unambiguous acts sufficient to give notice to his co-owner. Article 3478 provides that a co-owner, or his universal successor, may commence to prescribe when he demonstrates by overt and unambiguous acts sufficient to give notice to his co-owner that he intends to possess the property for himself. Article 3478 additionally provides: “The acquisition and recordation of a title from a person other than a co-owner thus may mark the commencement of prescription.” La. C.C. arts. 3439 and 3478 were adopted by Act 187 of 1982. As noted in the comments to these articles, the provisions are new, but do not change the law.
 
 Franks Petroleum Inc., supra.
 

 The issue becomes whether the 1963 deed from Lacy to John marked the commencement of prescription as contemplated by La. C.C. art. 3478. That an attempted conveyance is invalid is unimportant when determining | ¿whether a co-owner has given notice that he intends to possess for himself. As stated by this court:
 

 A recorded instrument may constitute notice to co-owners even though it is not translative of title. Thirty years acquisitive prescription is founded upon possession, not a deed translative of title. The function of the recorded instrument is simply to serve as an overt manifestation that a co-owner exclusively possessing is doing so by virtue of his claim to exclusive ownership. It is objective evidence that he possesses adversely to those who may claim to be his co-owners.
 
 Dupuis v. Broadhurst,
 
 213 So.2d 528 (La.App. 3d Cir.1968). In
 
 Dupuis,
 
 a partition, not translative of title, coupled with active and open possession for 30 years, was held to negate the presumption that the possessing owner was possessing for other co-owners. Likewise, in
 
 Minton v. Whitworth,
 
 393 So.2d 294 (La.App. 1st Cir.1980), the language of a recorded partition was held to be a clear indication that the parties thereto considered themselves to be the owners of the full interest in the property and to constitute notice to co-owners that subsequent possession of the property was adverse and hostile to their interests.
 

 Franks Petroleum, Inc.,
 
 446 So.2d at 866.
 

 A recorded act purporting to convey an interest in property in and of itself will not always constitute notice to the other co-owners. Otherwise, La. C.C. art. 3478 would read that the acquisition and recor-dation of a title from a person other than the co-owner “shall mark” the commencement of prescription, instead of “may mark” the commencement. The recorded instrument is not to be read in isolation. As noted by this court:
 

 [W]here a co-owner goes into and continues possession under a recorded instrument apparently conveying title, even though the purported conveyance may be invalid, the recorded instrument together with the acts of possession constitute notice to other co-owners. The possession is then regarded as hostile to the claims of the other co-owners, rebutting any presumption that possession is for the benefit of all co-owners.
 
 Succession of Seals,
 
 243 La. 1056, 150 So.2d 13 (1963);
 
 Franks Petroleum, Inc., supra; Givens, supra.
 

 Tilley v. Unopened Succession of Howard,
 
 43,013, pp. 4-5 (La.App. 2d
 
 *1270
 
 Cir.2/20/08), 976 So.2d 851, 854,
 
 writ denied,
 
 2008-0820 (La.6/6/08), 983 So.2d 922.
 

 In
 
 Franks Petroleum, Inc., supra,
 
 numerous recorded instruments served to give notice to co-owners of adverse possession. One such instrument was a judgment of possession in the succession of C.C. Colvin, one of the two brothers who originally owned the property, in which C.C. Colvin’s heirs were recognized as the owners of the whole interest in the property. The other instruments were quitclaim deeds from the widow and most of the heirs of John Colvin, the other brother, in which they recited that C.C. Colvin had purchased John Colvin’s interest in the property, but that the deed had been lost and not recorded.
 

 In
 
 Succession of Seals,
 
 243 La. 1056, 150 So.2d 13 (1963), Henry Seals, who was single at the time, purchased a tract of land. Henry died intestate, survived by his brothers and mother. One brother, Stokes, acquired from Henry’s widow any interest that she had in the tract, which was sufficient to give notice that he was to possess the property as sole owner. Stokes immediately moved onto the property and exercised acts of possession and ownership, such as farming, selling timber, and executing mineral leases.
 

 In
 
 Givens v. Givens, supra,
 
 a purported sale of land from mother to son, which was an invalid donation
 
 omnium bonorwm,
 
 served as notice to other co-owners that the son was possessing adversely to their interests. In
 
 Detraz v. Pere,
 
 183 So.2d 401 (La.App. 3d Cir.1966), a simulated sale Imfrom father to son was sufficient to give the required notice to co-owners. In
 
 Til-ley, supra,
 
 the property at issue had been the subject of an attempt by Walter, the owner of a quarter-interest, to transfer the quarter-interest that he stood to inherit upon his mother’s death to his brother Charlie, who also owned a quarter-interest.
 
 [3]
 
 Even though the invalid deed in
 
 Tilley
 
 was insufficient to transfer the quarter-interest that Walter was to inherit, it still served as notice that Charlie intended to adversely possess this quarter-interest.
 

 Immediately prior to the execution of the 1963 deed, John was not in the position of co-owner; rather, John purportedly had no ownership interest whatsoever at the time as Lacy was conveying interest in all of the property. Furthermore, based upon the evidence presented at trial, Lacy in fact had no interest to convey. In the cases cited above,
 
 [4]
 
 all the vendors or donors, except the widow in
 
 Succession of Seals,
 
 had some actual or future ownership interest that they were attempting to convey.
 
 [5]
 

 Even if the 1963 deed gave notice of commencement of prescription, it was not followed by acts that were consistent with adverse possession. In addition, any adverse possession was interrupted by the acts of co-owners.
 

 It is undisputed that John moved his family onto the property in the 1950s and raised his family there. However, the act of moving onto the | nproperty and establishing a home there would have been pri-
 
 *1271
 
 or to the marking of commencement of acquisitive prescription by the 1963 deed.
 

 What is apparent from the evidence presented at trial is that although John’s branch of the family resided on the property, it was still considered by his siblings and their descendants as belonging to all of them.
 

 Clarence and the other Cockerhams often met at the property for family reunions, holidays, and activities centered around family-related events. They would normally meet for a reunion or homecoming on the property in early June, and Clarence, who was 51 years old at the time of trial, could recall not meeting there only three years. The reunions usually lasted a weekend, but the family members may have gone to the property for a week to visit with relatives. Family members also sometimes took vacations there. Junior constructed a pavilion on the property in 1998 to be utilized for family events.
 

 Clarence grew up in Odessa, Texas, but used the property as his home address while attending Grambling State University. He would sometimes stay on the property during the summer when not in school. During his summertime visits, he would play and occasionally work on the property, helping John harvest pulpwood. When Clarence was younger, his father would stay during his summer visits, but as Clarence grew older, he would stay there on his own.
 

 Clarence thought of the property as a “family home.” He said that over the years there had been discussions about other family members building homes on the property. The only home on the property was where |12John and his family lived. The house had been rebuilt and repaired after several fires.
 

 Clarence related that in conversations with family members during reunions when John and Junior were present, the property was discussed as being family property, and neither John nor Junior ever objected.
 

 Clarence testified that neither John nor Junior ever indicated that they were attempting to claim the property as their own. Family members could freely come and go on the property. Clarence first thought that Junior was considering himself to be the sole owner when he received a call from Junior in October or November of 2002 asking that he sign off on Gene’s undivided interest in the property.
 

 Something out of the ordinary occurred around the time of the reunion held in June of 2003. Clarence and other family members received a letter and checks, some of which were for $700, from Junior. Junior wrote in the letter about the property’s history and listed the amounts of money that he had spent on the property since 1991. Of particular note, Junior wrote that the property had been lost in the 1940s because of unpaid taxes, and that Gene told John in the 1950s to redeem the property for John’s family, and that he (Gene) wanted no part of the property except to be able to come there and know it was still in the family. Junior also wrote that 60 acres were placed in his name in 1993, the remaining 20 acres were sold in 1994 but these 20 acres were bought back in 1998 by him as a sole owner, and that the checks represented benefits from these 20 acres.
 

 | isThe letter included a “by laws for family fund” stating that $2,000 would be set aside for a family fund and asked each recipient to add to the family fund. The “by laws” further stated that trees would be ready to cut in several years from the 60 acres for a profit, and they were open to suggestions, presumably about what to do with the profits. Clarence stated that although the letter contained references to
 
 *1272
 
 the property as family property, he thought of it as the first written declaration that anyone intended to possess the property as sole owner.
 

 A note accompanying the $700 check sent to Clarence’s mother stated that it was a “gift off of the place.” A note accompanying a $235 check to Clarence’s nephew stated, “this is from the proceeds on the place just wanted to share some since Uncle Gene was such a good uncle.” Each check stated in the memo section that it was for a “gift.” No additional checks were ever sent by Junior; the checks were never cashed.
 

 Clarence decided to do a title search of the property after receiving the check and letter from Junior. The paragraph in the letter stating that his father told John to redeem the property so he could have a home was what spurred his interest in inquiring about the land’s ownership. Clarence discovered the 1963 deed when he checked the public records.
 

 Clarence was unaware that Junior and his father ever allowed others to hunt on the property. At the 2003 reunion, Clarence noticed that many trees had been cut down and that natural gas residue storage tanks had been placed on the property. Clarence, who has been employed by a gas 114company for over 30 years, estimated that it would have taken about one to three months to erect those tanks.
 

 When Clarence was younger, he would help John harvest pulpwood to make money for the summer. Clarence was unaware if John cut pulpwood at other times. When Junior wrote in the 2003 letter that in 1998 he paid $15,000 to plant pine trees “for future profit for the family,” Clarence thought “family” meant the entire Cocker-ham family.
 

 Clarence stated that other family members outside of John’s branch had given money for the upkeep and maintenance of the property. For instance, Gene had paid taxes on the property. They also occasionally gave financial assistance to John and to John’s son Charles Jackson, who had recently started living on the property. Clarence gave a $100 check in September 2007, a $75 check in October 2007, and a $75 check in November 2007 to Jackson. Clarence gave this money to Jackson to help him pay bills on the property since Junior was now in prison.
 

 Clarence agreed that the only things actually done to the property were done by John or Junior, although he believed decisions about the property were discussed between his father and John because he heard some of these discussions.
 

 Patricia Cockerham is Junior’s niece. Her mother was John’s daughter. She was 51 years old at the time of trial. Patricia testified that she was born and raised on the property. Her grandparents helped raise her, and as she got oldei', she returned to the property for holidays, vacations, | ¡¿and when her mother thought she needed her grandparents’ influence. When she was growing up, she spent entire summers at the property.
 

 Patricia testified that after John had died and her grandmother had been moved to a nursing facility in Castor, there was a period when nobody lived on the property. The extended family discussed that they needed someone to look after the property, so it was agreed that when different family members were in the area, they would check on the property. Help was not rendered exclusively by John’s branch of the family; it was rendered by whoever was available.
 

 Patricia made contributions for the care and upkeep for the property, and she was aware that Clarence and other members of the family did likewise. For example, when nobody was living at the property,
 
 *1273
 
 she arranged to have the grass cut. Patricia testified that family members had constructed other buildings on the property, such as storage buildings and a washroom.
 

 Patricia had discussed with her grandfather about building a log cabin on the property. She recalled that he never raised an objection about these plans. Patricia did not remember John or Junior ever saying during the reunions that they were exclusive owners of the property.
 

 Patricia testified that the first time Junior indicated that he considered himself the exclusive owner of the property was through the check and letter that she received at the 2003 reunion. Prior to that, she had never received any notice from John or Junior that they were possessing the property as sole owners.
 

 | mPatricia always thought of the property as belonging to and as a home for the extended Cockerham family. She disagreed that John and his wife, Junior, and Charles Jackson were the only adults who had lived on the property. She recalled that her Uncle Don and his vafe had lived there for about a year in the late 1970s or early 1980s.
 

 In the expropriation proceeding, Steven Yancey testified as an expert in the examination of land titles. He testified that his conclusion was that Gene owned a 7/24 interest, Currie Mae owned a 7/24 interest, and Currie D. owned a 7/24 interest in the property. He also concluded that Junior owned a 3/24 interest on 60 acres of the property that had been donated by his father, but because there was no succession proceeding for John, he could not conclude with any certainty about Junior’s interest in the remaining 20 acres. He based his conclusion upon the judgment of possession in the succession of Mose Henry Cockerham, and the patent from the State to the heirs of Mose Henry Cockerham. We concur.
 

 A legal description of the property was attached to the judgment rendered in the expropriation proceeding in 2007. The exhibit listed the Cockerhams as having unknown ownership interests. The exhibit also referenced a 1998 conveyance of 20 acres of the property from John’s wife to Junior, and a 2004 conveyance of 60 acres of the property from Junior.
 

 As noted earlier, defendants presented no witness testimony at trial other than the proffered testimony. Exhibits offered by defendants were the 1963 deed and a May 1995 affidavit filed into Bienville Parish records in |17which it was stated that the affiants were unawai-e of anyone other than John’s family possessing any of the property in the prior 30 years.
 

 Based upon our review of the record, we cannot conclude that the trial court was manifestly erroneous in recognizing the ownership interests in the property of Clarence and other members of the Cock-erham family in addition to Junior and Melissa.
 

 DECREE
 

 With appellants to bear the costs of this appeal, the judgment is
 

 AFFIRMED.
 

 [1]
 

 . In that lawsuit, the court ruled that a natural gas pipeline company could expropriate a pipeline servitude across the property. Compensation of $50,000 was awarded.
 

 [2]
 

 . In addition, their attorney was prevented from calling witnesses at trial because he failed to list these witnesses on a pretrial list. A proffer was made of this excluded testimony, but this appeal has no assignment of error relating to this exclusion of evidence.
 

 [3]
 

 . In this same deed, Walter sold his own quarter-interest to Charlie.
 

 [4]
 

 .
 
 Franks Petroleum, Inc.; Succession of Seals; Tilley; Givens;
 
 and
 
 Detraz.
 

 [5]
 

 . Equitable concerns may have been at play in
 
 Succession of Seals,
 
 as the land was sold to Stokes to pay for his brother's succession debts, and there are numerous references in the opinion about absent co-owners having nothing to do with land until a special interest in oil or something else valuable arouses a dormant claim.